UNITED STATES v. STEPHENS.

(District Court, D. Delaware. November 13, 1917.)

No. 1.

1. ARMY AND NAVY ☞20—CONSCRIPTION FOR FOREIGN SERVICE—"MILITIA."
   Congress under the power given by Const. art. 1, § 8, to declare war, raise armies, and do all things necessary and proper for execution of that power, can by conscription organize the militia of the United States, as defined by National Defense Act June 3, 1916, § 57 (Comp. St. 1916, § 3041), for foreign warfare, and as incident thereto provide for enforced registration of those liable to the service, as done by Selective Draft Act May 18, 1917, § 5; the power given by such section of the Constitution to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions, with the implied inhibition against calling it out for any other purpose, relating to the organized state militia as such.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Militia.]

2. ARMY AND NAVY ☞20—CONSTITUTIONAL LAW ☞84—RELIGIOUS LIBERTY—SELECTIVE DRAFT LAW—"LAW RESPECTING AN ESTABLISHMENT OF RELIGION OR PROHIBITING THE FREE EXERCISE THEREOF."
   Selective Draft Act May 18, 1917, § 4, exempting ministers and students in recognized theological schools, is not a "law respecting an establishment of religion, or prohibiting the free exercise thereof," within the meaning of Const. Amend. 1.

**3. STATUTES** ⬤⇒64(1)—EFFECT OF PARTIAL INVALIDITY.

Were provision of Selective Draft Act May 18, 1917, § 4, exempting clergy and divinity students unconstitutional, it, while falling, would not affect the rest of the act, which is clearly separable therefrom.

**4. ARMY AND NAVY** ⬤⇒20—CONSTITUTIONAL LAW ⬤⇒62—DELEGATING LEGISLATIVE POWER—ESTABLISHING "COURTS"—SELECTIVE DRAFT BOARDS.

Const. art. 3, § 1, vesting the judicial power in the Supreme Court and such inferior courts as Congress may establish, is not contravened by Selective Draft Act May 18, 1917, § 4, authorizing the President to create and establish boards, to determine, subject to review by him, questions of exemption; they, though clothed with discretionary and quasi judicial powers, being essentially part and parcel of the executive machinery of the government.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Court.]

**5. STATUTES** ⬤⇒64(1)—EFFECT OF PARTIAL INVALIDITY.

Were Selective Draft Act May 18, 1917, § 4, in so far as providing that certain officers and classes of persons, though exempt from selective draft, shall not be exempt from service in any capacity that the President shall declare to be noncombatant, to be held to contemplate involuntary servitude, in contravention of Const. Amend. 13, it would merely fall, and, being separable, not affect any other provision of the act.

**6. ARMY AND NAVY** ⬤⇒20—CONSTITUTIONAL LAW ⬤⇒62—DELEGATING LEGISLATIVE POWER—RAISING ARMY.

Selective Draft Act May 18, 1917, § 1, providing that the President be and hereby is "authorized" to raise, organize, officer, and equip all or such number of the increments of the regular army provided for by National Defense Act June 3, 1916, as he may deem necessary to raise all organizations of the regular army to the maximum enlisted strength authorized by law, to draft and organize and officer any or all members of the National Guard and of the National Guard Reserves, and to raise by draft as therein provided, and organize, officer, and equip an additional force of 500,000, or such part or parts thereof as he may at any time deem necessary, considered with the preceding words, "In view of the existing emergency, which demands the raising of troops in addition to those now available," and with section 2, providing that the enlisted men required to raise and maintain the organization of the regular army and to complete and maintain the organizations embodying the members of the National Guard drafted into the service of the United States, at the maximum legal strength as by this act provided, shall be raised by voluntary enlistment, or, if and whenever the President decides that they cannot effectually be so raised or maintained, then by selective draft, and with Joint Resolution April 6, 1917, declaring a state of war between the United States and the Imperial German Government, and that the President is authorized and "directed" to "employ the entire naval and military forces of the United States and the resources of the government to carry on war against the Imperial German Government," does not delegate to the President the power, vested in Congress, to raise an army; it not attempting to give him an uncontrolled option to take or omit to take steps for the organization and equipment of the miliary forces of the United States as contemplated by Congress, but merely committing to him the execution of the general scheme of Congress, with necessarily large discretionary powers.

Donald Stephens was indicted for failure to register under Act May 18, 1917. On demurrer to indictment. Demurrer overruled.

Charles F. Curley, U. S. Atty., of Wilmington, Del.

Henry Budd, of Philadelphia, Pa., for defendant.

BRADFORD, District Judge. An indictment has been found against Donald Stephens charging him with violation of the act of Congress of May 18, 1917, entitled "An act to authorize the President to increase temporarily the Military Establishment of the United States." The defendant has demurred to the indictment, and its sufficiency is now to be determined. Section 5 of the above act, so far as pertinent to this case, is as follows:

"Sec. 5. That all male persons between the ages of twenty-one and thirty, both inclusive, shall be subject to registration in accordance with regulations to be prescribed by the President; and upon proclamation by the President or other public notice given by him or by his direction stating the time and place of such registration it shall be the duty of all persons of the designated ages, except officers and enlisted men of the regular army, the navy, and the national guard and naval militia while in the service of the United States, to present themselves for and submit to registration under the provisions of this act; and every such person shall be deemed to have notice of the requirements of this act upon the publication of said proclamation or other notice as aforesaid given by the President or by his direction; and any person who shall wilfully fail or refuse to present himself for registration or to submit thereto as herein provided, shall be guilty of a misdemeanor and shall, upon conviction in the district court of the United States having jurisdiction thereof, be punished by imprisonment for not more than one year, and shall thereupon be duly registered: * * * Provided further, that persons shall be subject to registration as herein provided who shall have attained their twenty-first birthday and who shall not have attained their thirty-first birthday on or before the day set for the registration, and all persons so registered shall be and remain subject to draft into the forces hereby authorized, unless exempted or excused therefrom as in this act provided."

Pursuant to the above section and on the day of the approval of the act the President made proclamation to all persons subject to registration in the several states and District of Columbia, that the registration would be had June 5, 1917, at the registration place in the precinct wherein they had their permanent homes, and defining the class of persons required to register.

The indictment alleges in substance that the defendant June 5, 1917, being included in the class of persons subject to registration under the act, was required by the President's proclamation to present himself for and submit to such registration at the proper registration place in the district of Delaware, on the day and between the hours designated in the proclamation, and unlawfully and wilfully failed and refused so to present himself for and submit to registration. The grounds of demurrer are in substance as follows: (1) That the act of May 18, 1917, is in violation of section 8 of article I of the Constitution. (2) That it is in violation of article I of the amendments to the Constitution. (3) That it is in violation of section 1 of article III of the Constitution. (4) That, in so far as it provides for the assignment of drafted persons to service other than military, it is in violation of article XIII of the amendments to the Constitution. (5) That in other respects it is in violation of the Constitution.

[1] Section 8 of article I so far as material to the consideration of this case is as follows:

"Section 8. The Congress shall have power to lay and collect taxes, duties, imposts and excises, to * * * provide for the common defence and general welfare of the United States; * * * to declare war; * * * to

raise and support armies; * * * to provide and maintain a navy; * * * to make rules for the government and regulation of the land and naval forces; to provide for calling forth the militia to execute the laws of the Union, suppress insurrections and repel invasions; to provide for organizing, arming and disciplining, the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the states respectively, the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress; * * * to make all laws which shall be necessary and proper for carrying into execution the foregoing powers," etc.

In section 57 of the act of Congress of June 3, 1916, entitled "An act for making further and more effectual provision for the national defense, and for other purposes," 39 Stat. 166, 197 (Comp. St. 1916, § 3041), it was provided:

"The militia of the United States shall consist of all able-bodied male citizens of the United States and all other able-bodied males who have or shall have declared their intention to become citizens of the United States, who shall be more than eighteen years of age and, except as hereinafter provided, not more than forty-five years of age, and said militia shall be divided into three classes, the national guard, the naval militia, and the unorganized militia."

It is urged on the part of the defendant that Congress possesses only such powers as have been expressly or by fair implication conferred upon it by the Constitution; that the "militia of the United States" includes all able-bodied citizens of the United States and all other able-bodied males who have or shall have declared their intention to become citizens of the United States, who shall be older than the minimum and younger than the maximum ages above specified, subject to exceptions not pertinent in this connection; that the only purposes for which Congress is empowered to provide for calling forth the militia are to "execute the laws of the Union," to "suppress insurrections," and to "repel invasions"; and that the war in connection with which the act of May 18, 1917, provides for a registration, contemplates military service in foreign fields, and not merely the accomplishment of the ends for which the militia under the terms of the Constitution can be compulsorily called out. It is not denied, but conceded, that the regular army as constituting part of the permanent military establishment of the United States may be compelled to render military service abroad. But it is asserted that this obligation results from the fact that the soldiers of the regular army in their contract of enlistment consent to such service, and that without such consent they could not constitutionally be sent abroad to take part in the war. In other words, it is contended that, however exigent the demand for military operations on a large scale in Europe, however inadequate the regular army to conduct those operations, the government is powerless in this dire struggle between democracy and a powerful autocracy practising the atrocities of barbarism and threatening the freedom of the world to compel any one not belonging to the permanent military forces of the nation, to fight for this country in the only place where, perchance, his efforts may be of avail. Were such the case, the American nation would present a pitiable spectacle of emasculated sovereignty. But I regard the contention as utterly unsound. The fundamental right of self-preservation forbids any construction of the Constitution so lim-

iting powers of Congress essential to continued national existence. In the preamble to the Constitution it is declared that the people of the United States "do ordain and establish this Constitution" in order to "provide for the common defence, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity." As means to the attainment of those beneficent ends the Constitution em-. powers Congress to declare war, to raise and support armies, to provide and maintain a navy, and, in addition to the provisions touching the militia, to enact all laws necessary and proper for carrying these powers into execution. These broad powers, essential to the welfare and life of the nation, are not, I think, restricted or impaired in any manner by the provisions touching the militia.

The power of Congress to raise armies, like the power to declare war, is unconditional, unqualified and absolute; and Congress is the exclusive judge of the necessity for the exercise of the power and of the means and manner prescribed by it for its exercise. The constitutional provisions relating to the militia manifestly apply to state militia in contradistinction to militia of the United States. Otherwise it would be difficult to understand the provision "reserving to the states respectively, the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress." Further, the clause providing for "calling forth the militia to execute the laws of the Union, suppress insurrections and repel invasions" is predicated upon the organization of the militia, without which the ends intended could not be attained. The provisions of the Constitution relating to the militia having application only to the organized state militia, it does not follow, from the lack of power in Congress to send such militia to fight in a foreign country, that Congress has not power to organize the militia of the United States and send it to any part of the globe deemed best for the conduct of military operations. There is no necessary or logical connection between the two propositions. The militia of the United States, as defined in the act of June 3, 1916, is sufficiently inclusive to embrace most, if not all, of the individuals composing the militia, organized or unorganized, of the several states. But should they by conscription be drafted into an army destined for foreign parts they would necessarily lose the character of organized state militia, and the implied constitutional inhibition against calling out the organized state militia except to "execute the laws of the Union, suppress insurrections and repel invasions" would cease to apply. The power of Congress to declare war and raise armies is absolute and paramount, and must be recognized, even if the exercise of the power interferes with the organization of the state militia in such manner as to leave no subject to which the inhibition can apply. That power infinitely transcends, in importance, the retention of organization of state militia with the result that it can be used for no useful purpose, except the accomplishment of the three specified objects within or substantially within the national domain.

War was formally declared by the United States against Germany April 6, 1917. The joint resolution containing the declaration sets forth:

"That the state of war between the United States and the Imperial German Government which has thus been thrust upon the United States is hereby formally declared; and that the President be, and he is hereby, authorized and directed to employ the entire naval and military forces of the United States and the resources of the Government to carry on war against the Imperial German Government; and to bring the conflict to a successful termination all of the resources of the country are hereby pledged by the Congress of the United States."

Under these circumstances the position taken on the part of the defendant that, although an able-bodied American citizen of proper age, he has not given his consent and, therefore, cannot be compelled to serve his country in a foreign field, or submit to registration, cannot be maintained. That the exercise of the constitutional power to raise armies should be dependent upon the consent of the proposed soldiers is a startling proposition which this court is not prepared to accept. In Angelus v. Sullivan, 246 Fed. 54, —— C. C. A. ——, the Circuit Court of Appeals for the Second Circuit said with respect to the act in question:

"This court has no doubt as to the constitutionality of the act of Congress. The Constitution, article I, § 8, expressly provides that the Congress shall have power to raise and support armies, and to provide and maintain a navy, and to make rules for the government and regulation of the land and naval forces. The purpose of the conscription act is to raise an army, and the right to raise it does not involve the exercise of an implied power but of one expressly granted. How can the courts deny to Congress a right which the Constitution in plain and distinct terms confers upon it? The Constitution in conferring the power upon Congress has not prescribed the mode in which the power shall be exercised. The power is conferred fully, completely and unconditionally. It is for the Congress to determine the means by which the army shall be raised. It is left to its judgment whether it shall be raised by calling for volunteers, or whether it shall be raised by conscription. At the time the Constitution was adopted conscription was not an unknown mode of raising armies, but had been resorted to by governments throughout the world. * * * If it had been intended that Congress should not have the power to raise anything but a volunteer army the grant of power would have been restricted and not made unconditional."

I am satisfied that Congress under the power to declare war, to raise armies, and do all things necessary and proper for the execution of that power, has full constitutional authority by conscription to organize the militia of the United States for foreign warfare, and, as incident to the exercise of that authority, to provide for and enforce the registration of those liable to serve. Further, it does not appear that the army the Government is engaged in raising may not be used to "execute the laws of the Union, suppress insurrections and repel invasions," as well as to serve abroad; and it is not denied that for the former purposes the militia of the United States may be compelled to register and render military service.

[2, 3] The second ground of demurrer is that the act of May 18, 1917, violates article I of the amendments to the Constitution. That article provides, among other things, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." In section 4 of the act it is provided:

"Regular or duly ordained ministers of religion, students who at the time of the approval of this act are preparing for the ministry in recognized

245 F.—61

theological or divinity schools, * * * shall be exempt from the selective draft herein prescribed; and nothing in this act contained shall be construed to require or compel any person to serve in any of the forces herein provided for who is found to be a member of any well-recognized religious sect or organization at present organized and existing and whose existing creed or principles forbid its members to participate in war in any form and whose religious convictions are against war or participation therein in accordance with the creed or principles of said religious organization."

It is argued that "the exemption of members of 'recognized' churches which hold certain beliefs and the holding to service of persons, not members of such churches, or of any church, who hold the same belief, is an act of establishment of religion, in the sense in which the words are used in the Constitution, i. e. the conferring of a benefit upon a person, qua church member, which would be refused to the same person were he not such a member."

And further, that the "exemption of the clergy and divinity students by section 4 is a direct move in the establishment of religion. It recognizes them as a class exempt from certain duties of other citizens, and is a direct legislative support of recognized churches or sects by bestowing an immunity upon their leaders."

There are two answers to the second ground of demurrer. Section 4 is not a "law respecting an establishment of religion, or prohibiting the free exercise thereof." Clearly it does not prohibit the free exercise thereof, nor is it a law respecting an establishment of religion in the sense in which those words are used in the amendment. The framers of the Constitution intended to prohibit the union of church and state, and to that end withheld from Congress the power to legislate for the official recognition or management of a religious organization as an institution connected with or upheld by the government. I find nothing in section 4 violative of the first amendment properly construed. But were it otherwise, while the provision criticized would fall, the rest of the act would not be affected; for those provisions are clearly separable from the other provisions of the act, and "it is a settled rule 'that statutes that are constitutional in part only will be upheld so far as they are not in conflict with the Constitution, provided the allowed and prohibited parts are separable.'" Presser v. Illinois, 116 U. S. 252, 263, 6 Sup. Ct. 580, 583, 29 L. Ed. 615.

[4] The third ground of demurrer is that the act is violative of section 1 of article III of the Constitution. That section provides that "the judicial power of the United States shall be vested in one supreme court, and in such inferior courts as the Congress may from time to time ordain and establish."

Section 4 of the act provides:

"The President is hereby authorized, in his discretion, to create and establish throughout the several States and subdivisions thereof and in the Territories and the District of Columbia local boards, and where, in his discretion, practicable and desirable, there shall be created and established one such local board in each county or similar subdivision in each State, and one for approximately each thirty thousand of population in each city of thirty thousand population or over, according to the last census taken or estimates furnished by the Bureau of Census of the Department of Commerce. Such boards shall be appointed by the President, and shall consist of three or more members, none of whom shall be connected with the Military Establishment,

to be chosen from among the local authorities of such subdivisions or from other citizens residing in the subdivision or area in which the respective boards will have jurisdiction under the rules and regulations prescribed by the President. Such boards shall have power within their respective jurisdictions to hear and determine, subject to review as hereinafter provided, all questions of exemption under this Act, and all questions of or claims for including or discharging individuals or classes of individuals from the selective draft, which shall be made under rules and regulations prescribed by the President, except any and every question or claim for including or excluding or discharging persons or classes of persons from the selective draft under the provisions of this Act authorizing the President to exclude or discharge from the selective draft 'Persons engaged in industries, including agriculture, found to be necessary to the maintenance of the Military Establishment or the effective operation of the military forces, or the maintenance of national interest during the emergency.' The President is hereby authorized to establish additional boards, one in each Federal judicial district of the United States, consisting of such number of citizens, not connected with the Military Establishment, as the President may determine, who shall be appointed by the President. The President is hereby authorized, in his discretion, to establish more than one such board in any Federal judicial district of the United States, or to establish one such board having jurisdiction of an area extending into more than one Federal judicial district. Such district boards shall review on appeal and affirm, modify, or reverse any decision of any local board having jurisdiction in the area in which any such district board has jurisdiction under the rules and regulations prescribed by the President. Such district boards shall have exclusive original jurisdiction within their respective areas to hear and determine all questions or claims for including or excluding or discharging persons or classes of persons from the selective draft, under the provisions of this Act, not included within the original jurisdiction of such local boards. The decisions of such district boards shall be final except that, in accordance with such rules and regulations as the President may prescribe, he may affirm, modify or reverse any such decision. Any vacancy in any such local board or district board shall be filled by the President, and any member of any such local board or district board may be removed and another appointed in his place by the President, whenever he considers that the interest of the nation demands it. The President shall make rules and regulations governing the organization and procedure of such local boards and district boards, and providing for and governing appeals from such local boards to such district boards, and reviews of the decisions of any local board by the district board having jurisdiction, and determining and prescribing the several areas in which the respective local boards and district boards shall have jurisdiction, and all other rules and regulations necessary to carry out the terms and provisions of this section, and shall provide for the issuance of certificates of exemption, or partial or limited exemptions, and for a system to exclude and discharge individuals from selective draft."

It is contended on the part of the defendant that under the above provisions the boards intended to be created and established by the President possess judicial functions and are inferior courts in the sense in which those words are used in the section of the Constitution now considered, and as such could be ordained and established, not by the President, but only by Congress, and that therefore those provisions constitute an unconstitutional attempt by Congress to delegate authority to the President. The boards undoubtedly possess discretionary or quasi judicial powers, but are not inferior courts in the constitutional sense. The raising of an army by authority of Congress under an act providing for it is an executive and not a judicial function. Congress having by joint resolution declared war against Ger-

many, provided in and by the act of May 18, 1917, among other things, for the raising of an army by draft or conscription, and that certain persons and classes of persons should be exempt or might be exempted by the President from the selective draft. Authority was given to the President, who is at once the commander in chief of the army and navy and the chief executive of the nation, to create and establish the local and district boards. The function of these boards, unlike that of judicial tribunals, is not the administration of justice as between man and man, or the punishment of offences against society, but is, while discretionary or quasi judicial, essentially executive in its nature. The boards are constituted for the purpose of determining who are and who are not to be compelled to render military service. The local boards have power to hear and determine, subject to review as provided in the act, questions of exemption thereunder, and questions of or claims for including or discharging individuals or classes of individuals from the selective draft, subject to exceptions as provided in the act. The district boards are given power to review and affirm, modify or reverse the decisions of the local boards, and also to hear and determine questions or claims for including or excluding or discharging persons or classes of persons from the selective draft, not included within the original jurisdiction of the local boards. Further, decisions of the district boards may in accordance with rules and regulations to be prescribed by the President be affirmed, modified or reversed by him. All these powers and duties relate exclusively to the efficient raising and composition of an army, and belong to the executive branch of the government. Their discretionary or quasi judicial character does not affect their essentially executive, in contradistinction to judicial, nature. There are many boards of public officers admittedly constituting part of the executive department of the government, clothed with discretionary and quasi judicial powers. The nature and purpose of their functions rather than their discretionary character furnish the test for determining whether they belong to the executive or to the judicial department. It is true that phraseology is employed in connection with the local and district boards which could appropriately be applied to judicial as distinguished from executive functions, but this circumstance cannot change the essential nature of the boards as part and parcel of the executive machinery of the government.

[5] The fourth ground of demurrer is that the act, in so far as it provides for the assignment of drafted persons to service other than military, is a violation of article XIII of the amendments to the Constitution, declaring that "involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted," shall not exist within the United States, or any place subject to their jurisdiction. Section 4 of the act provides, as above stated, that certain officers and classes of persons shall be exempted from the selective draft, but that "no person so exempted shall be exempted from service in any capacity that the President shall declare to be noncombatant." It is argued that this provision contemplates involuntary servitude in the sense of the Constitution. It is not necessary to dwell

upon this contention. If it be assumed that the provision is invalid it would fall, but, being separable, would not affect the force of other portions of the act. An assignment, actual or potential, by the President of a person exempt from the draft to service in a noncombatant capacity is wholly unrelated to an unlawful omission to submit to registration, for which the defendant has been indicted. It may be added, however, that the Supreme Court, in Butler v. Perry, 240 U. S. 328, 332, 36 Sup. Ct. 258, 259 (60 L. Ed. 672), has used language of much significance on this point, as follows:

"This amendment was adopted with reference to conditions existing since the foundation of our government, and the term involuntary servitude was intended to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results. It introduced no novel doctrine with respect of services always treated as exceptional, and certainly was not intended to interdict enforcement of those duties which individuals owe to the state, such as services in the army, militia, on the jury, etc. The great purpose in view was liberty under the protection of effective government, not the destruction of the latter by depriving it of essential powers."

[6] Another ground of demurrer was assigned ore tenus at the hearing, to the effect that the act of May 18, 1917, is unlawful in that the power to raise an army is vested in Congress, and Congress by the act does not exercise that power, but attempts "to give the President power at his discretion to raise an army and in a very great measure to determine of whom it shall consist."

Congress is empowered by the Constitution to raise armies; but mere congressional volition cannot accomplish the end. It requires a declared legislative intent followed by action to effectuate it. Such action cannot be taken by the members of Congress, for it not only would be impracticable, but would involve an encroachment by the legislative upon the executive branch of the government. It is, therefore, necessary, that executive agencies shall expressly or impliedly be directed or required by Congress to give practical effect to the legislative intent. This is necessarily involved in an exercise of power to raise armies. The act of May 18, 1917, provides in substance that "the President be and he is hereby authorized" to raise, organize, officer and equip all or such number of increments of the regular army provided by the national defense act of June 3, 1916, or such parts thereof as he may deem necessary to raise all organizations of the regular army to the maximum enlisted strength authorized by law; to draft into the military service of the United States, and organize and officer, any or all members of the national guard and of the national guard reserves; and to raise by draft as therein provided, and organize, officer, and equip, an additional force of 500,000 men, or such part or parts thereof as he may at any time deem necessary. The contention on the part of the defendant, based upon the application to the President of the term "authorized," assumes that no duty to take action is imposed on him, but that the act undertakes to vest in him an uncontrolled option to take or omit to take steps for the organization and equipment of the military forces of the United States as contemplated by Congress. This is a false assumption. The act

when read in connection with the joint resolution declaring war, and other legislation in pari materia, leaves no doubt on this point. By that resolution the President is not only "authorized" but expressly "directed" to "employ the entire naval and military forces of the United States and the resources of the government to carry on war against the Imperial German Government." It is so improbable as to be well nigh morally impossible that Congress intended by the act in question to authorize the President to disregard what it had less than a month and a half previously so solemnly and emphatically "directed" him to do. Further, it appears on the face of the act that it was passed "in view of the existing emergency, which demands the raising of troops in addition to those now available." That the act did not confer a mere option, but an obligation, upon the President is further apparent from the following portion of section 2:

"That the enlisted men required to raise and maintain the organizations of the regular army and to complete and maintain the organizations embodying the members of the national guard drafted into the service of the United States, at the maximum legal strength as by this act provided, shall be raised by voluntary enlistment, or if and whenever the President decides that they cannot effectually be so raised or maintained, then by selective draft; and all other forces hereby authorized, except as provided in the seventh paragraph of section 1, shall be raised and maintained by selective draft exclusively," etc.

And in the deficiency appropriation act of June 15, 1917, the sum of $2,658,413 is appropriated for "all expenses necessary in the registration of persons available for military service and in the selection of certain such persons and their draft into military service." The people of the United States through their representatives in Congress having by joint resolution declared war against Germany, and directed the President to employ the entire naval and military forces of the United States to carry it on, and having pledged the resources of the country to bring the war to a successful termination, and Congress by the act of May 18, 1917, having empowered the President to organize and equip the military forces of the United States for the prosecution of the war, the public was vitally interested that such organization and equipment should be effected, and it became the duty of the President to act, equally as if, instead of the word "authorize," the words "empowered and directed" had been employed.

Large discretionary powers in carrying into execution the general scheme or plan defined by Congress properly were conferred upon the President as the chief exutive and commander of the army with respect to the choice of means and other details. Legislative treatment of such matters with the requisite particularity and with reference to varying conditions and exigencies is impracticable, and committing them to the executive branch of government is not to be treated as a delegation of legislative power. There is nothing novel or repugnant to the Constitution in thus disposing of them. In Angelus v. Local Board, supra, the court said:

"But it is said that this particular act is unconstitutional because Congress has delegated to the President the power to raise armies. The objection is without merit. The Congress has authorized the President to resort to conscription and has determined the class of persons who shall be subject

to it. It is the duty of the President to see that the law is carried into execution, and it is within the power of Congress to give him a discretion in respect to certain specified matters. The cases are numerous in which the courts have sustained the grant of powers which involve in a large degree the exercise of discretion and judgment. And it has been the practice of Congress for years to pass laws which have invested the President with discretionary authority that cannot be considered a delegation of legislative power."

The provisions of the act of May 18, 1917, for the organization and equipment of the military forces of the United States, being constitutional and valid, the provision requiring registration to effectuate that purpose, for alleged non-compliance with which the defendant has been indicted, also is constitutional and valid; and therefore the demurrer must be overruled, and the defendant required to plead to the indictment.

⊛⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes