**99 P.2d 715**

**STATE ex rel. CHARLTON, Adjutant General, v. FRENCH, State Treasurer.**

**No. 4527.**

Supreme Court of New Mexico.

Feb. 20, 1940.

Rehearing Denied Feb. 26, 1940.

Fred E. Wilson, of Albuquerque, and Harry S. Bowman and William A. Watson, both of Santa Fe, for relator.

Filo M. Sedillo, Atty. Gen., and A. M. Fernandez, Asst. Atty. Gen., for respondent.

ZINN, Justice.

On September 8, 1939, following the invasion of Poland by the armed forces of Germany and the declaration of war upon Germany by both England and France, the President of the United States issued his proclamation declaring á limited national emergency to safeguard and enforce our own neutrality and for the purpose of strengthening our national defense. Following this, the Governor of the State of New Mexico on October 27, 1939, ordered the Adjutant General to call to active duty and to assemble the National Guard of New Mexico, or such portion thereof as the Adjutant General might deem necessary, to take such steps and incur such necessary and lawful expense, as he might deem necessary, for converting the 111th Cavalry into a regiment of anti-aircraft artillery. Such call and order of the Governor was made "in order to better provide for the public defense."

Acting under such order, the Adjutant General, the relator here, issued Special Order No. 117, dated the same day as the Governor's order, calling to active duty a portion of the National Guard to make the conversion of the 111th Cavalry into a regiment of anti-aircraft artillery.

The military code, 1929 Comp.St., Ch. 93, provides that commissioned officers and enlisted men of the National Guard may be ordered upon special duty at the discretion of the Governor as Commander in Chief. Comp.St.1929, Sec. 93-137. This reads as follows: "Special duty. Commissioned officers and enlisted men of the national guard, may be ordered upon special duty at the discretion of the governor as commander-in-chief, and shall receive the base pay of their respective grades during the time they may continue upon duty under such order; Provided, that in addition to such base pay while upon such duty, officers and enlisted men shall receive the same rental allowance, subsistence allowance and longevity pay, as is paid to officers and enlisted men of like grade in the army of the United States while on similar duty." It also provides that the Governor shall from time to time publish such orders as may be necessary to conform the National Guard in organization and armament to the National Guard of the United States. Sec. 93-116 is as follows: "Governor may publish orders. The governor is hereby authorized and it shall be his duty from time to time to make and publish such orders as may be necessary to conform the national guard of the state of New Mexico in organization, armament and discipline and oth-

erwise, to that prescribed for the organized national guard of the states by the war department of the United States, and for this purpose the governor may alter, increase, consolidate, diminish, disband or discharge officers, enlisted men, departments, staff corps, retired lists, and organizations. Provided: That no organization of the New Mexico national guard, which has been federally recognized, and has received the benefits provided in the national defense act, shall be disbanded or be permanently removed from one locality, city, town or county, to another city, town or county, without the approval of the secretary of war." It further provides that the necessary expenses incurred in quartering, caring for, warning for duty, and transporting and subsisting the troops shall be paid by the State. Sec. 93-174. In addition, the statutes provide for the issuance of certificates of indebtedness to pay such expenses, as follows: "The State Treasurer, upon the presentation to him of vouchers and pay rolls, for such expenses and compensation, certified by the officers commanding such forces, and approved by the Adjutant General, shall pay such vouchers and pay rolls out of any moneys in the State Treasury not otherwise appropriated, should the vouchers and pay rolls for such service not exceed in amount the sum of $5,000.00 If the vouchers and pay rolls for such service exceed the amount of $5,000.00, then he shall forthwith execute in behalf of and in the name of the state, a certificate of indebtedness for the money required to pay such vouchers and pay rolls; such certificates shall bear interest at the rate of not to exceed four per centum per annum and shall be payable on the first day of February, following the expiration of two months from their issue, and the amount thereof shall be raised in the next tax budget of the state succeeding their issue, and applied to the payment of such certificates." § 93-174 as amended by L. 31, Ch. 39, § 12.

On November 17, 1939, relator presented to the State Treasurer his voucher and pay roll, duly certified, covering expenses of the conversion and for the compensation of that portion of the National Guard on active duty and assembled to effect such conversion. This amounted to $5,600. Of this sum $5,300 covered expenses and $300 compensation. The Adjutant General requested the respondent to forthwith execute a certificate of indebtedness in the amount of $5,600, in the form required by law. The respondent refused. Thereupon, the Adjutant General applied to this court for a writ of mandamus requiring the respondent to show cause why he should not honor the voucher and issue the certificate of indebtedness. The writ was issued in the alternative and the respondent duly made his return and answer.

The relator presents a threefold theory upon which he rests his claim of right to a writ of mandamus to compel the respondent to honor the voucher as requested.

First, that the voucher presented to the respondent is in due form and certified by the officers commanding such forces and

approved by the Adjutant General, and being regular on its face must be honored by the respondent without question, unless it clearly appears on the face of the voucher that the Governor had no constitutional or statutory power to cause the indebtedness to be incurred.

Second, that since a portion of the National Guard was on duty and assembled, that all expenses of making the conversion, and especially the expense of providing suitable and adequate shelter and quarters for the troops and equipment, are included in the language of 1929 Comp.St. Sec. 93-174, amended by L.1931, Ch. 39, Sec. 12, as being "necessary expenses incurred in quartering, caring for, warning for duty, and transporting and subsisting the troops."

Third, that inasmuch as the Governor has the constitutional and statutory power as Commander in Chief to call the National Guard to active duty for any military purpose, it was not necessary for the Governor to issue any proclamation as to the emergency which caused him to exercise his powers.

The respondent resists the writ primarily because the voucher includes expenditures for the alteration of buildings now owned by the National Guard of the State of New Mexico. The respondent argues that the use of materials and labor for such construction or alteration does not constitute the "quartering" of members of the National Guard while presently on duty on call of the Governor, but is in fact the alteration or repair of existing armories for the future permanent use of the National Guard and no funds for such purpose have been appropriated by the Legislature as contemplated by Comp.St.1929, Sec. 93-183.

Pursuant to Art. V, Sec. 4, N.M.Const., the Governor has power to call the militia in certain limited specified instances. Pursuant to Sec. 2, Art. XVIII, the Legislature has the duty to provide for the organization, discipline and equipment of the militia and to provide for its maintenance. Having the power and the duty under the Constitution to provide for the organization of the militia, the Legislature accepted the benefits and provisions of the National Defense Act. 39 Stat. 166 as amended. It enacted a complete code governing the organization, personnel, compensation, the care and management of armories, and many other matters too numerous and unnecessary to mention in this opinion. L. 1925, Ch. 113 (1929 Comp.St. Ch. 93) as amended L.1931, Ch. 39, L. 33, Ch. 89.

The Constitution makers did not say that the Legislature shall organize the militia. The mandate is that they shall *provide for* the organization of the militia. The Legislature, by Chapter 93, has declared its legislative policy of establishing a militia. By Sec. 93-103, it classified the militia into the National Guard and the unorganized militia. There is no other classification in the Act. We do not find in the Act any mention of cavalry, infantry, artillery, aircraft, naval forces, or any other branch of the service. There is no specific mention of the 111th Cavalry. That appellation to our

National Guard Unit is one which comes out of the regular Army or the National Guard of the Nation.

The Legislature could have responded fully to the constitutional mandate that it should provide for the organization, discipline and *equipment* of the militia by enacting a law designating the Governor as the agency of the State to organize, discipline, equip and call out the militia for special duty in an emergency without offending the constitutional provision against the delegation of legislative powers as argued by respondent. This is conceded by Mr. Justice SADLER in his dissenting opinion.

In United States v. Stephens, D.C., 245 F. 956, judgment affirmed in Stephens v. United States, 247 U.S. 504, 38 S.Ct. 579, 62 L.Ed. 1239, it was decided that the Selective Draft Act May 18, 1917, Sec. 1, 50 U.S.C.A. § 226 note, in terms declaring the President "authorized" to raise army, *held* in view of preceding words and Sec. 2., National Defense Act June 3, 1916, 39 Stat. 166, and joint resolution April 6, 1917, 40 Stat. 1, not to delegate the power vested in Congress to raise an army, but to merely commit to him execution of its scheme.

If the Congress of the United States, which is authorized to raise an army, could authorize the President to raise an army, then our Legislature could *provide* for the organization of a militia by directing the Governor to organize it, or authorize the Governor to call the militia to duty in an emergency. The Legislature is not always in session. It may be necessary to mobilize the military forces of the State into active service instantly.

It may become necessary to equip the National Guard with new and modern weapons of defense because of imminent danger when the Legislature is not in session.

█ Comp.St.1929, Sec. 93-116, supra, directed the Governor, and made it his duty, to issue such orders from time to time to conform the National Guard of New Mexico to that prescribed by the war department. It is not difficult to understand the reason for inserting in the National Guard Act the provisions of Sec. 93-116, supra. This is not a delegation of legislative authority. See State ex rel. Sofeico v. Heffernan, 41 N.M. 219, 67 P.2d 240.

It is not to be questioned that measures looking to the more effective national defense and purposes of state defense are of more emergent concern than the protection of the wild life of our State, thought to be emergent in that case.

█ The Legislature *did* make an outline of the organization and did provide for the organization of the militia. But they realized that in the matter of conforming such organization and equipment to the organization and equipment of the regular Army of the United States, that changes might be required to be made quickly, with the rapid advance in the science of modern warfare and the preparation for such war-

fare, that would make it impractical to await the action of the Legislature in either regular or special session, so they selected the logical agent of the State, namely, its Chief Executive, who is the Commander in Chief of the military forces of the State, to execute the general scheme outlined by the National Guard Act in one very important respect, to-wit: "from time to time * * * to conform the National Guard * * * in organization, armament and discipline and otherwise, to that prescribed * * * by the war department of the United States, * * *" as need therefor should arise from *time to time*. The fact that this duty was imposed on the Governor shows that in the mind of the Legislature it was an emergent duty that ought not to be permitted to wait on the sessions of the Legislature. Surely this action of the Legislature in imposing this duty on the Governor shows that it is a *special* duty, and that it is an *emergent special duty*. We accept the definition of the respondent as to the meaning of the word "special" as found in said Sec. 93-137 as being out of the "ordinary."

■ When commissioned men and officers of the National Guard are called to the performance of such special duty they are engaged in an emergent special duty. While the duty thus imposed on the Governor may undoubtedly be special in the sense that it is out of the ordinary, still the fact that duties may be special and extraordinary do not render the act imposing such duties unconstitutional. Our own decision

in State ex rel. Sofeico v. Heffernan, supra, decided that while it was exclusively in the power of the Legislature to designate what were and what were not game animals, it was not a delegation of legislative power to place in the control of the game commission the matter of regulation of the hunting and destruction of such game animals. For a broad statement of the rule, see Cooley's Constitutional Limitations, 8th Ed., page 228.

Who is in a better position to ascertain the facts from time to time as to the equipment in use by the regular army than the Commander in Chief of the State's military forces, assisted by his Adjutant General and the officers of the National Guard? Who is better circumstanced than the Governor to mobilize the National Guard for emergent special duty to provide for the public defense?

■ The Legislature had the power to place the duty on the Governor, when he knew of an emergent situation, which instantly and immediately required the equipping of the National Guard to conform to the equipment of the regular army of the United States, to better provide for the defense of our people. It is the duty of the Governor to obey this legislative mandate because such mandate is a *law*.

It seems reasonable, that if the Governor has the power and it is his duty to conform the equipment of the National Guard to the equipment approved and employed by the United States Army, to provide for the defense of its citizens, then it would naturally

follow that the Governor has the power to provide for the housing of such equipment as may be needed for such purposes, and for the protection of such equipment from the elements, for its convenient use, etc.

■ The Constitution, Sec. 4, Art. V, and the Statute, Sec. 93-137, gave authority to the Governor to order the militia into active service as therein provided. When acting within the power vested in him the Governor may order into active service the militia of the State and direct into what locality they shall go or operate. He is made the sole judge of the facts that may seem to demand the aid and assistance of the military forces of the State. The presumption of course is that he will not exercise this power unless it becomes necessary. See 12 R.C.L. 1006, "Governor" § 9. To his good judgment and sound discretion, the law has left the final decision as to whether the military arm of the State shall be ordered into active service. If he acts wisely and prudently, well and good. If he acts hastily or unwisely or imprudently, there is no power in the courts to control or restrain his acts.

■ If there is a latent fear that some chief executive, under the powers granted him, may build a Maginot line along the south border of New Mexico and thus plunge the State of New Mexico hopelessly in debt, then the solution is a repeal of the authority vested in the Governor. That is for the Legislature and not the Court. Any attempt on the part of the judicial department of the State to interfere would be an interference by one department of the Government with another contrary to Art. III of the Constitution of the State: "The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as in this constitution otherwise expressly directed or permitted."

■ We can only determine whether the Governor is acting under a constitutional or statutory power. State ex rel. Roberts v. Swope, 38 N.M. 53, 28 P.2d 4.

■ The power conferred upon the Governor by Sec. 93-116 to organize the militia and the power conferred on him by Sec. 93-137 to meet emergencies is ample for every situation that may present itself. It gives to the Chief Executive of the State the fullest authority to reorganize and equip the National Guard and to call to his assistance in any contingency that may arise, a force sufficient in numbers and properly equipped, to safeguard the welfare and health of the people and provide for their defense.

■ The respondent claims, however, that the expenditure of money to quarter men and equipment not in active duty does not come within the provision of the law. It is contended by relator in oral argument, and not denied by the respondent, that the 111th Cavalry is a unit of cavalry, unat-

tached to any division. This we take it to mean that it is not attached to any regular division of cavalry of the National Guard of the Nation. The respondent does not deny the argument of the relator that under such a situation, in the event of war, the officers and men of this regiment of cavalry will be used as replacements. Personnel replacements include all personnel destined to replace losses or to bring any unit up to its prescribed strength. "A replacement is an officer, nurse, warrant officer, or enlisted man available for assignment. For convenience they will be referred to herein as filler replacements and loss replacements. Filler replacements will be considered as those replacements needed initially to raise units to prescribed strength. Loss replacements will be considered as the replacements needed to replace losses." War Department Manual for Commanders of Large Units, Vol. II, Administration, Chap. 4, page 15, prepared under the direction of the Chief of Staff United States Government Printing Office, Washington, 1935.

With a prospect of war always imminent under the present world conflagration, a regard for the welfare of New Mexico's organized National Guard composed of our own citizens would naturally motivate the Governor, if motive be necessary, to order a conversion of an unattached regiment of cavalry into a unit properly equipped to face modern warfare.

In the event of war, the 111th Cavalry as now organized would be scattered into unknown units. The men would be command-ed by strange officers, teamed with strange men and assigned to replace casualties and they themselves would likely become casualties.

As to the argument that the voucher covers the cost of building materials and labor and is in fact the alteration or repair of armories for the future permanent use of the National Guard, and for which funds have not been appropriated by the Legislature as contemplated by 1929 Comp.St., Sec. 93-182, we are not impressed. That there are contemplated certain alterations in present armories is not questioned. The issuance of certificates of indebtedness without limit is not confined to instances when the militia is called out by the Governor under his constitutional power. Expenses are bound to be incurred whether the Governor calls the militia to suppress riot or repel invasion or to provide for the public defense.

Our colleagues, dissenting from our decision, make the strange argument that the State may contract debts only to provide for the public defense, Const. Art. 9, Sec. 7, if the militia be called to preserve the public peace, to execute the laws, suppress insurrection and repel invasion, Art. 5, Sec. 4, Const., but may not contract debts to provide for the public defense to do what Art. 18, Sec. 2, commands: "provide for the organization, discipline and equipment of the militia." It would be sad to convict the constitution makers with having made provision for employing the credit of the State to secure funds to defray the expenses of the militia when "called out" to suppress in-

surrection and repel invasion, but could not by the same process organize, discipline and equip a militia to be in readiness to be called out. As we view the phrase "to provide for the public defense" means just exactly what it says, namely, to provide a militia of the kind required by the constitution makers.

Surely it would be poorly providing for the public defense to wait until there is an insurrection or an invasion before organizing a militia to suppress and repel. It would be poor business strategy to holler for the insurance agent to write an insurance policy when the house was burning.

The following appears in the Article on Militia in Encyclopedia Americana: "In 1903 the United States Congress adopted a new militia law, by which the militia was defined to be practically all able-bodied males between 18 and 45 years, divided into two classes, namely (a) 'the Organized Militia,' being such forces as may be created, under State laws, regardless of the name they bear, and (b) the remainder of the militia. A period of five years was given to all the States to adopt laws making the organization, drill and discipline of their organized militia the same as that of the regular army and the participation of the States in an annual appropriation of $1,000,000 was made dependent on such State action and the creation of forces accordingly; the limit in number was as it stood theretofore, to wit, 100 men for each Congressional representative; those States which became entitled to participate in the annual fund became a part of the 'Organized Militia.' Authority was given to the President to call forth such number of the militia 'organized' or 'reserve,' as he might deem necessary, in case of invasion, danger of invasion. * * *" Consulting the act of 1903, 32 Stat. 775, we find this an accurate statement. We think it not unlikely that pertinent provisions of our Constitution were adopted with a knowledge of the foregoing.

In view of this historical background we would hesitate to say that the language of Art. 5, Sec. 4, giving the Governor power to "call out the militia to * * * repel invasion" does not embrace the power to call out such militia in case of "danger of invasion".

The foregoing is employed to illustrate our view that "to provide for the public defense" embraces considerations of "preparedness" as well as execution.

Viewing the matter from the date the Constitution was adopted, which is of the more vital importance in providing for the public defense—to organize discipline and equip a militia, or to call it out? Manifestly that cannot be called out which does not exist. Art. 18, Sec. 2, is in pari materia with Art. 5, Sec. 4, just as much as Art. 9, Sec. 7.

Too much stress has been laid by relator upon the benefits to be derived from the conversion of the cavalry to an anti-aircraft unit. A belief has been formed that such benefits are of a pecuniary nature only. The conversion of New Mexico's unat-

tached cavalry unit into an anti-aircraft artillery is of benefit to the State. We need not go into the relative merits of cavalry units as against the value of mechanized units. That is a matter of concern and determination for those to whom is entrusted such knowledge and such duties, to-wit, the Commander in Chief of our State and his military staff. It is not for us of the pre-air generation to question their judgment. The Commander in Chief has determined this for us.

That the money necessary to pay the men whom the Adjutant General called out for this special duty is within the provisions of the law cannot be questioned. The record is barren of evidence as to the amount of money to be expended in quartering the anti-aircraft units. The best we can understand from the record is that the amount ultimately to be expended is in the approximate sum of $21,870. At the present time there are on active duty two men. The relator contemplates calling such other officers and enlisted men of the National Guard to active duty, and to assemble them from time to time as it may be necessary, in order to fully carry out the order of the Governor. The writ alleges that the items of expense covered in the voucher are for the compensation for the troops and the expense of providing adequate shelter and "quarters" suitable for the new equipment which will be used by the anti-aircraft artillery unit, and as shelter and quarters for the troops composing the unit. Incidental thereto is the pay of a clerk.

What is the meaning of the term "quartering" of troops? "Quarter" in a military sense has become the usual term applied to stations, buildings, lodgings, etc., in the regular occupation of military troops. The Encyclopaedia Britannica, 11th Ed., vol. XXII, p. 713. "Quartering" according to Webster's New International Dictionary, Second Edition, means in the military sense: "To shelter, or furnish with shelter or entertainment; to supply with lodging; esp., to assign to a certain place of shelter, as soldiers; often with on or upon; as, the regiment was quartered on the inhabitants of the town."

According to the Encyclopaedia Britannica, 11th Ed., vol. III, p. 427, in modern British Barracks, used for the accommodation of military forces, over each man's bed is a locker and shelf where he keeps his kit; "and his rifle stands near the head of his bed." That is the method of "quartering" a soldier in barracks. A place for himself, his kit and his gun. An anti-aircraft unit with anti-aircraft guns requires more than a place at the head of the bed for such guns. We assume that quartering of anti-aircraft guns necessarily requires alterations in present buildings. If the alterations to be made in the present armories to provide places for anti-aircraft guns do become permanent parts of our present armories, then such per-

manency is merely incidental to the main purpose, which is the conversion ordered by the Governor.

Assuming that the Governor called a single cavalry troop to quell a riot. Assuming that in order to quarter such troop there had to be constructed gun-racks in an existing armory to hold the rifles of the men. The gun-racks constructed under such circumstances might become a permanent part of the armory. That would be a valid expenditure. Clearly there is no difference, except in degree, in the contemplated expenditure. The construction of the gun-racks would be merely incidental to the main purpose, which would be the quelling of a riot. *The main purpose in the instant case before us is the conversion of the cavalry to a mechanized unit in an emergency to better provide for the public defense.* Incidental to the conversion comes the alteration of the armories. The cost is not determinative of the main purpose. The clerical hire is likewise incidental to the main purpose. The Governor has not only the power, but also the duty to order the conversion. The rest is incidental.

Respondent attempts to distinguish this case from the case of Lord & Burnham Co. v. City of New York, 132 Misc. 64, 229 N.Y.S. 598, 604, cited by relator as authority, because in that case the garage contemplated to be constructed, the expense of which construction was questioned, was a temporary and not a permanent structure. The New York case was based on a New York statute, identical with ours. In that case in response to the request of the Mayor of New York City, the Adjutant General of the State of New York, by direction of the Governor, issued special orders calling out certain portions of the National Guard, on the theory that there was necessity therefor to protect the city against the dangers of damage and injury to property. Under the orders of the Governor and the Adjutant General, the National Guard was assembled and a portion detailed to protect a certain aqueduct in and around Millwood, New York. An order and certificate was issued by some official in charge of this detail for the purchase of certain goods and the performance of certain labor, including material for the construction of a garage, which was connected with the barracks. On various grounds, the city treasurer refused to pay the voucher, among them being that the military law does not cover garages. On this point the court said: "That the language of section 211 is broad enough to cover building a garage, as contrasted with any other necessary structure—say a barrack—scarcely admits of argument. It includes 'the necessary expenses incurred in quartering, caring for, warning for duty and transporting and subsisting the troops.' The characteristic and usual means for transporting the modern soldier and his supplies, such as food, clothing, and ammunition, is the motor truck. The garage in question was designed to shelter motor-trucks in a climate where such shelter is essential."

We are unable to distinguish between the necessary construction of a garage in an emergency, even though deemed of a temporary nature, or the emergent construction of gun-racks for a troop of cavalry on duty, which gun-racks may ultimately become a permanent part of an existing armory, or the alteration of existing armories to house anti-aircraft guns when a conversion of the guard is ordered by the Governor in the present emergency. A technical distinction may be drawn, but such fine technicalities cannot be indulged in when we are resolving questions going to the method of providing for the military defense of our State and Nation.

For the reasons given the writ of mandamus will be made absolute.

It is so ordered.

BICKLEY, C. J., and MABRY, J., concur.

SADLER, Justice (dissenting).

When the true meaning of two pertinent provisions of the state constitution is ascertained, it proves decisive of this case. In § 4 of Art. V, we find language as follows: "The supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed. He shall be commander in chief of the military forces of the state, except when they are called into the service of the United States. *He shall have power to call out the militia to preserve the public peace, execute the laws, sup-press insurrection and repel invasion.*" (Italics mine.)

Art. IX, § 7, provides: "The state may borrow money not exceeding the sum of two hundred thousand dollars in the aggregate to meet casual deficits or failure in revenue, or for necessary expenses. *The state may also contract debts to supress insurrection and to provide for the public defense.*" (Italics mine.)

The italicized portions of these separate constitutional provisions, considered in pari materia, fairly establish as the intention of the framers of the constitution that the state's unlimited power to borrow without the approving vote of the electorate required by Art. IX, § 8, but lifted as to purposes mentioned in Art. IX, § 7, is limited to the occasions which under Art. V, § 4, authorize the Governor to call out the militia "to preserve the public peace, execute the laws, suppress insurrection and repel invasion". To put the question differently, are not the named occasions, just quoted, which warrant calling out the militia synonymous in meaning with another group of words, to-wit, "to suppress insurrection and to provide for the public defense", as to which an exercise of the state's borrowing power without stint or limitation is authorized? Do not both groups of words contemplate the same emergent situation? When the framers of the constitution in Art. IX, § 8, released all restraint upon the state's borrowing power for the purposes mentioned in Art. IX, § 7, was it not solely for the purpose

of putting the financial might of the state behind the Governor when moving under the authority to employ the militia given him in Art. V, § 4? My study of the question compels me to give an affirmative answer to all of these inquiries.

The line which best marks the point of division between the majority and me is put into bold relief by this statement in the majority opinion: "The issuance of certificates of indebtedness without limit, is not confined to instances when the militia is called out by the Governor under his constitutional power."

It is my considered judgment that the direct opposite of this assertion represents the true intention of the framers of the constitution. And, a consideration of other constitutional provisions and pertinent statutes confirms me in the correctness of this conclusion. The majority place much reliance upon Const. Art. XVIII, § 2, imposing upon the legislature the duty of providing for the "organization, discipline and equipment of the militia" to conform to standards of the regular army "as nearly as practicable" and to "provide for the maintenance thereof". This provision is not difficult to understand. The maintenance contemplated is to be provided through biennial appropriations to meet all normal requirements of the military department, such as constructing, altering or repairing armories, salary of the Adjutant General, and the expense of maintaining his office and of conducting encampments for the training of members of the organized militia. All of these are expenses which can be foreseen, budgeted and appropriations made to cover them as has been the invariable custom since statehood.

On the other hand, if it be an expense incident to the Governor's exercise of his powers under Art. V, § 4, viz., "to preserve the public peace, execute the laws, suppress insurrection and repel invasion", emergencies which in their very nature ordinarily could not await specific appropriations, the legislature has not been remiss in the performance of its duty to provide for the maintenance of the militia in this instance. If the expense be one of the last mentioned kind, under the provisions of 1929 Comp. St. § 93-174, the State Treasurer is ordered to pay vouchers properly certified up to $5,000 from any moneys in the treasury, not otherwise appropriated; and, if in excess of that sum, to raise the money to meet the emergency through the sale of certificates of indebtedness.

If, as the majority assert and I agree, the legislature has permissibly delegated to the Governor as Commander-in-Chief of the militia, the details of executing its constitutional power of providing for the organization, discipline and equipment of the militia, it is entirely reasonable to suppose, since it is a legislative power being thus executed by the Governor, that it has retained to itself the power to control the occasion of its exercise, if such exercise calls for expenditures beyond the limits of specific legislative appropriations.

The legislature must have thought it had done so when it enacted in the military code, L.1925, c. 113, §§ 83, 84, 1929 Comp.St., §§ 93-182 and 93-183, that all repairs and the maintenance of armories, stables, storehouses, etc., should be paid by the state but provided that no moneys should be thus expended "unless the funds be from an appropriation made by the legislature for such specific purpose".

Notwithstanding the delegation by the legislature to the Governor of the power to execute the details of conforming the militia "as nearly as practicable" to the standards of the regular army, I am quite satisfied it has retained to itself the power to determine the occasion for the execution of this power, where such execution calls for the expenditure of funds beyond the limits of specific appropriations. This conclusion at the same time satisfies me that in all enactments adopted for special duty and expenses incident thereto, payable from certificates of indebtedness, the legislature never so much as contemplated that such special duty would not relate itself to one of the objects named in Art. V, § 4 of the constitution, authorizing the Governor to call out the militia. This declaration of legislative intent is supported by the fact that, if so construed, the provisions for special duty and payment therefor from borrowed money are within the constitution and, if otherwise construed, they are beyond it. Where alternative meanings are to be deduced from a legislative enactment, one of which would over-ride constitutional barriers and the other respect them, it must be assumed that the legislature intended to do what it constitutionally could do.

The framers of the constitution thus very wisely authorized the state under legislative sanction to borrow without stint and without the delay incident to popular referenda to defray the expenses of the militia called out by the Governor in the exercise of his constitutional power to meet the emergencies enumerated. They thus conceived that, at all cost, the state must be defended against widespread disorder affecting the public peace, organized resistance to execution of the laws, open insurrection and threatened invasion. Long range provision for the public defense, however, involving as it otherwise would an extraordinary and unlimited exercise of state's borrowing power, freed from the restraint of popular referenda, they just as wisely committed to the legislature's sole discretion, the exercise of which it is powerless to delegate and which, when exercised, must take the form of specific appropriations.

Surely, the framers of our constitution did not contemplate that the "organization" of the militia pursuant to the constitutional mandate given in Art. XVIII, § 2, would occur under such emergent circumstances that an exercise of the state's extraordinary unlimited and unfettered borrowing power found in Art. IX, § 7, would be necessary to accomplish it. If they had sensed the likelihood, or even

possibility, of such emergencies attending the organization of the militia (and there is nothing in the history of their time to suggest it), they would have accomplished the organization by self-executing provisions of the constitution itself.

Since it is an admitted fact that the assignment to active duty by the Governor of the officers whose compensation and expenses the voucher rejected by the State Treasurer is intended, in part, to pay does not rest upon a call or proclamation under Const. Art. V, § 4, and there were no moneys in the treasury not otherwise appropriated with which to pay it, the respondent Treasurer properly declined to pledge the state's credit to raise the amount of money mentioned in the voucher. Any statute purporting to authorize him thus to pledge the state's credit, and there are none when properly construed, would run afoul of constitutional inhibitions.

In reaching the conclusion announced, it is not meant to say the Governor must call out the militia under a declaration of martial law before the unlimited exercise of the state's borrowing power by the legislature alone comes into play. As I interpret these constitutional provisions, the Governor, with or without the declaration of martial law, can call out all or any part of the organized militia, assigning the units or men to general or special duty, as the exigencies of the occasion require, and if by his call, he relates their service to his constitutional power in that

behalf, found in Art. V, § 4, the public treasury and the state's borrowing power are opened wide to the uncontrolled discretion of the legislature in furnishing the financial support needed. But until the Governor's call does so relate their services, the borrowing power of the state at the legislature's behest in nonexistent.

It is suggested that the occurrence of a catastrophic fire or flood might warrant the Governor in calling out the militia. This, I dispute, if it is sought to make either the basis of the call. But if, as usually is the case, such a calamity endangers security of the public peace, or renders imminent any of the other perils to combat which the Governor is authorized to employ the militia, he may put the military forces at the scene of the danger, resting his call upon it, a constitutional ground for calling out the militia.

The conclusion that there is here shown no power to pledge the state's credit renders it unnecessary to determine whether, if the power existed, the alterations in existing armories for which the greater part of the money to be vouchered will be spent, would reasonably classify as a proper expenditure as "expenses incurred in *quartering* * * * the troops * * * " within 1929 Comp.St. § 93-174, as amended by Laws 1931, c. 39, § 12.

The amount of public money presently involved is comparatively small. And all the advantages to accrue to the people and the organized militia of New Mexico from the conversion of the cavalry unit into an anti-

aircraft unit, as urged upon us, may be conceded. Yet there being no unappropriated moneys in the treasury, it is to the legislative and not the executive branch of the state government that those favoring it should go for the money with which to accomplish the change. The legislature, in granting or withholding the appropriation needed, would be moving in the performance of its true constitutional function of providing for the organization, discipline and equipment of the militia and its maintenance. Const. Art. XVIII, § 2.

The conclusion of the majority reflects a misconception, it seems to me, of the true purpose of Art. IX, §§ 7 and 8, unleashing the state's borrowing power. Section 7 among other things, says: "The state may also contract debts to suppress insurrection and to provide for the public defense". Section 8 then excepts debts so contracted from the restraint of popular referenda. Although the language "to provide for the public defense" in no manner enlarges the Governor's power in reference to the militia, nevertheless, the effect of the majority decision is to lift this phrase from Art. XVIII, § 2, and transfer it to Art. V, § 4, as an added ground authorizing him to call out the militia. Its absence from its accustomed place, however, proves illusory. For, after serving to support a call to put the militia in the field, we find the phrase still performing its true constitutional function of authorizing borrowing to support the militia thus employed.

The chief thing wrong about the whole procedure is the absence of constitution-al grounds for the call. Unfortunately, we do not have the benefit of a copy of the Governor's call or proclamation placing certain officers on special duty. Indeed, it is not shown whether it is oral or written. We merely glean from the pleadings that the call to special duty is based on provision "for the public defense". While provision for the public defense inheres in every ground which authorizes the Governor to call out the militia, the call when made must rest upon one or more of the specific grounds mentioned in Art. V, § 4, and not upon the elastic phrase, "to provide for the public defense".

The decision in this case is far reaching. It is perfectly true as argued by the Attorney General as counsel for the State Treasurer, that through the slightly opened door authorizing the pledge of the state's credit to the extent of approximately $21,000, for present purposes, could as easily and with no less logic or reason pass any amount of public funds for certain military purposes not contemplated by Const. Art. V, § 4, without the necessity of specific appropriations or an approving vote of the electorate. For instance, if original estimates of altering present armories to receive new equipment should prove erroneous and its cost should approximate $50,000, instead of $21,000, under the majority decision the State Treasurer must pay and pay through money borrowed from the sale of certificates of indebtedness. Did the framers of the constitution or the legislators providing for special duty intend this? I am confident

they did not. All this could be accomplished in the name of "providing for the public defense".

I realize that, where power has been conferred in clear and unambiguous language, it affords no proof of its non-existence to assert that it may be abused. But where a doubt as to its true meaning fairly arises, a consideration of what *can* be done under it has legitimate weight in determining what was intended should be done. And so, I assert again an abiding conviction that when the framers of the constitution conferred power upon the state through its legislature in Art. IX, § 7, to borrow without limit and without popular restraint to suppress insurrection and "to provide for the public defense", they conceived of defense against the dangers only enumerated in Art. V, § 4, which furnish the Governor his warrant for calling out the militia. It undoubtedly was their thought that funds with which to combat all other dangers, if any, should await legislative action at regular or special sessions.

I think the alternative writ should be quashed. The majority being of a contrary view, for the reasons given, I dissent.

BRICE, Justice (dissenting):

I concur in all that Mr. Justice SADLER has said in his dissenting opinion, the logic of which is so convincing that I can see no escape from his conclusions.

The majority opinion should have stated that special order No. 17 provided for the calling out of two militiamen for six months, instead of "calling to active duty a *portion* of the National Guard." It is in that regard misleading.

It was frankly admitted by relators upon the oral argument that the whole object of the order was to convert the Santa Fe armory to permanently house the equipment of that unit of the National Guard after it is converted into a regiment of anti-aircraft artillery. It is sought to do so by virtue of Sec. 93-137 N.M.Comp.Sts. Ann.1929, which provides for the payment of salaries etc., of officers and enlisted men when called out upon "special duty", and Secs. 93-172 and 93-174 for remuneration and "quartering", etc.

No member of the court doubts the good intention of the Governor and his Adjutant General, nor the fact that the ends are desirable; but do the ends contemplated justify the means by which it is sought to spend out of the public treasury, without appropriation by the legislature, the sum of $21,000 for remodeling the Santa Fe armory? It was the policy of the makers of the Constitution to prohibit the expenditures of public funds without an appropriation by the legislature, except in cases of greatest emergency specifically excepted in the Constitution.

The legislature is "the State" in the disposition of state funds, and is made so, not necessarily upon the theory that the Gov-

ernor would misuse the authority if delegated to him, but that the people of the state, through their representatives, should control the expenditure of its funds.

If we assume that the Santa Fe armory can be remodeled as contemplated by the expedient of calling out two men for a period of six months and that the remodeling of the armory is "necessary expenses incurred in quartering, caring for", etc., of such two men on special duty, then the Governor at his will is authorized to spend a hundred thousand dollars for such purpose without an appropriation by the legislature, and may extend the remodeling program to each National Guard unit in the state. That the statute had reference to temporary quartering of the national guardsmen while on active duty seems certain to me.

The provision of the statutes for the payment for quartering troops while on duty has reference to "quartering" the specific troops called out while on temporary duty only, not for building or remodeling quarters for the housing of a National Guard unit and its equipment, permanently.

The proceeding should be dismissed.

### On Motion for Rehearing.

ZINN, Justice.

A motion for rehearing has been filed in which our attention is called to a statement in our opinion that: "The issuance of certificates of indebtedness without limit, is not confined to instances when the militia is called out by the Governor under his constitutional power."

This is manifestly incomplete, and should be amplified. Our thought is: "The issuance of certificates of indebtedness without limit, is not confined to instances when the militia is called out by the Governor under his constitutional power as reflected by Art. V, Sec. 4, of the Constitution alone." We think the State may, under the provisions of Article IX, Sec. 7: "contract debts to * * * provide for the public defense" in other instances, one of which is to: "provide for the organization, discipline and equipment of the militia, which shall conform as nearly as practicable to the organization, discipline and equipment of the regular army of the United States." Art. 18, § 2.

By way of additional clarification, if any is needed, we quote 12 R.C.L. Art. "Governor", § 4: "A governor of a state is a mere executive officer; his general authority very narrowly limited by the constitution of the state; with no undefined or disputable prerogatives; without power to affect one shilling of the public money, but as he is authorized under the constitution, or by a particular law; having no color to represent the sovereignty of the state, so as to bind it in any manner to its prejudice, unless specially authorized thereto. And therefore all who contract with him do it at their own peril, and are bound to see (or take the consequence of their own indiscretion) that he has strict authority for any

contract he makes." Citing Chisholm v. Georgia, 2 Dall. 419, 1 L.Ed. 440. We find it unnecessary to enter into a discussion as to whether the provision of Art. IX, Sec. 7, that "the state may also contract debts to suppress insurrection and to provide for the public defense" is self executing. We find the provisions of the statutes cited in our opinion sufficiently comprehensive to show that the Legislature in authorizing the issuance of certificates of indebtedness has manifested an intention to draw upon and execute the power delineated in Art. IX, Sec. 7.

It would serve no good purpose to repeat or amplify the argument in the opinion that to provide for the public defense by providing for the organization, discipline and equipment of the militia in conformity as near as practicable with the organization, discipline and equipment of the regular army, is an emergency. To assert that emergencies may arise when the Governor has power to call out the militia to preserve the public peace, execute the laws, suppress insurrection, and repel invasion, and yet that the organization, discipline and equipment of a militia to be subject to the call of the Governor is not emergent, does not appeal to us as sound reasoning.

The motion for rehearing should be denied and it is so ordered.

BICKLEY, C. J., and MABRY, J., concur.

BRICE and SADLER, JJ., dissent, for the reasons already stated.