**Juan Isidro VALDEZ et al., Plaintiffs-Appellants,**

v.

**Joe BLACK et al., Defendants-Appellees.**

**No. 108–70.**

United States Court of Appeals, Tenth Circuit.

July 8, 1971.

Joel M. Gora, New York City (Melvin L. Wulf, New York City, Jonathan B. Sutin, Paul A. Phillips, Albuquerque, N. M., with him on the brief), for plaintiffs-appellants.

Sumner S. Koch, Santa Fe, N. M. (William W. Gilbert, of White, Gilbert, Koch & Kelly, Santa Fe, N. M., and Joyce Blalock, Sp. Asst. Atty. Gen., with him on the brief), for State Police appellees.

Mark B. Thompson, III, Asst. Atty. Gen. (James A. Maloney, Atty. Gen., with him on the brief), for defendant-appellee John Jolly.

Patricio S. Sanchez, of Serna & Sanchez, Santa Fe, N. M., for defendant-appellee Alfonso G. Sanchez.

Before BREITENSTEIN, McWILLIAMS, and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is a civil rights case brought pursuant to 42 U.S.C. §§ 1983 and 1985. According to the complaint, the thirteen plaintiffs are all either members of, or related to members of, an organization composed of Spanish-speaking Americans known as Alianza Federal de Mercedes.

The nineteen defendants are grouped as follows: (1) Alfonso Sanchez, the district attorney for the first judicial district of the State of New Mexico; (2) Joe Black, Chief of the New Mexico State Police; (3) fourteen named persons who are members of the New Mexico State Police; (4) Adjutant General John Jolly, Commander of the New Mexico National Guard; and (5) two named persons who are members of the New Mexico National Guard.

The gist of the complaint is that the nineteen defendants by their various and sundry actions growing out of a succession of independent though related events occurring over a period of time of about one week had under color of state law deprived the plaintiffs of rights guaranteed them by the United States Constitution, specifically the right of free speech and assembly, the right to petition their government for redress of grievances and the right to be free from unreasonable searches and seizures and arrest. Each plaintiff made claim for $3,000.

Trial by jury culminated in verdicts for the defendants on the claims of twelve of the thirteen plaintiffs. The jury returned a verdict in favor of one plaintiff, Sevedeo Martinez, and against four members of the New Mexico State Police in the amount of $3,000. The present appeal is directed to the judgments entered dismissing on the merits the claims of all plaintiffs other than Martinez.

One of the announced objectives of the Alianza is to recapture certain land which it believes rightfully belongs to its members in particular and United

States citizens of Spanish or Mexican ancestry in general. The series of events which form the basis for the present proceedings occurred from about June 1 to 6, 1967, during which time the Alianza held several mass meetings and reached a climax on June 5, 1967, when members and relatives of members of the Alianza conducted an armed raid on the courthouse in Tierra Amarilla, New Mexico.

■ At this stage of the proceedings the evidence, which needless to say was in some dispute, is to be viewed in a light most favorable to the prevailing party in the trial court, namely, the several defendants. Larabee Flour Mills Co. v. Carignano, 49 F.2d 151 (10th Cir.); Seifert v. Solem, 387 F.2d 925 (7th Cir.). Viewed in such light, the voluminous evidence adduced upon an eight day trial is summarized not so briefly as follows:

(1) On May 14, 1967, the Alianza held a meeting in the courthouse in Tierra Amarilla, the county seat of Rio Arriba county, at which time the Alianza planned a "take-over" of the local government of Tierra Amarilla and "elected" their own slate of officers who were to assume various offices to which others had theretofore been duly elected or appointed;

(2) by May 31, 1967, it became public information that the Alianza would hold another mass meeting on June 3, 1967, at Coyote, New Mexico;

(3) on June 1, 1967, the one defendant Sanchez, the district attorney, appeared before a district judge seeking issuance of arrest warrants and upon the presentation thus made the judge caused warrants to issue for the arrest of some eleven persons who had participated in the earlier Alianza meeting of May 14, 1967, one warrant calling for the arrest of Juan I. Valdez, one of the plaintiffs, on a charge of violating the state statute on unlawful assembly;

(4) Sanchez, the district attorney, had several meetings on or about June 1 and 2, 1967, with Joe Black, Chief of the New Mexico State Police, and three or four of its members, at which time Sanchez delivered the eleven arrest warrants to Black for execution and at the same time there was also general conversation regarding the upcoming meeting of the Alianza;

(5) concerning the scheduled meeting of the Alianza on June 3, it was agreed that the State Police would establish roadblocks on the highways leading to Coyote and would advise those desiring to attend that they could do so but that if the assembly turned into an "unlawful" one, guilty parties would be prosecuted;

(6) on June 2, 1967, Valdez was arrested in his home at about ten o'clock in the evening and taken to the county jail in Santa Fe, where he was later released on a cash bond on or about June 4;

(7) the Alianza held their scheduled meeting in Coyote on June 3, 1967, though its leader, Reies Tijerina, was not present, he being one of the eleven for whom arrest warrants had issued, with that particular warrant not having been executed as of the June 3 meeting;

(8) the State Police did set up roadblocks in connection with the Coyote meeting, advising those desirous of attending that though they could assemble peaceably, any violation of the state's unlawful assembly statute would be the subject of prosecution, with none of those thus advised being deterred from attending the meeting in question;

(9) another meeting of the Alianza was thereafter scheduled for June 5, 1967, at the Tobias Leyba ranch near Canjilon, New Mexico, and on the morning of June 5, 1967, many members of the Alianza, together with their families, began to assemble on the Leyba ranch for an overnight camp;

(10) shortly after noon on June 5, 1967, a group of Alianza members and relatives, armed with guns, dynamite and knives, set out from the Leyba ranch for Tierra Amarilla and this group forcibly "took over" the courthouse in that town

from about three till five p. m., during the course of which numerous shots were fired, public officials were wounded and kidnapped and for some two hours the courthouse was in the control of insurrectionists;

(11) a district judge, who was literally a prisoner in his own courtroom during the raid, sensing that the situation was beyond the control of the local authorities, caused his reporter to first call the State Police, and when the reporter was unable to contact the State Police he then called the office of the Governor of the State of New Mexico to report the nature and extent of the armed rebellion;

(12) the Lieutenant Governor, then acting as Governor, thereupon issued a proclamation declaring Rio Arriba County, Tierra Amarilla being the county seat, to be in a state of extreme emergency and called out the National Guard to assist in restoring peace and order;

(13) the courthouse raiders left Tierra Amarilla about five o'clock p. m. and returned to the Leyba ranch, with the State Police, and eventually the National Guard, converging upon the Leyba ranch;

(14) the persons thus found on the Leyba ranch were thereafter marched in small groups from the camping area to the ranch house proper by the State Police, with the National Guard later giving some assistance, where they were interviewed, with names and statements and the like being taken, and then, though there was talk of arresting all, most were allowed to return to their camp;

(15) however, some of those participating in the raid on the courthouse were singled out of the group camping on the Leyba ranch and arrested, with other participants in the raid fleeing the group and disappearing into the nearby woods;

(16) on the late afternoon of June 6, 1967, the State Police and the National Guard left the Leyba ranch and the members of the Alianza and their families were permitted to leave the area if they desired.

Two of the plaintiffs, Filomena Valdez and her son Elizardo Valdez (no relation to the plaintiff Juan I. Valdez) base their respective claims on events occurring in the aftermath of the courthouse raid. Moments after the raid, as the raiders were en route from Tierra Amarilla to the Leyba ranch near Canjilon, Elizardo, age fifteen, was arrested by State Police. The police made the arrest on the basis of statements from two citizens who came forth out of the milling crowd and reported to the officers that they had just overheard Elizardo say that he was in on the raid and had participated in its planning. The circumstances were that the informants overheard Elizardo's remarks, ran over and informed the police of what they had just heard. This all occurred on the streets of Canjilon where things were in a general state of confusion. Elizardo, apparently seeing the informants talking to the police, fled the scene at once on horseback, with the police thereupon giving immediate chase in an automobile. It was in this setting that the arrest was made about which Elizardo now complains. In his later statement to the officers, Elizardo stated that he was not actually a participant in the raid, though he had known about it in advance and had sat in on some of the planning of the raid.

Other State Police on a couple of occasions a day or two after the raid went to the home of Filomena Valdez in search of two of her sons who were believed to have participated in the raid. Mrs. Valdez testified that the officers in question had unlawfully searched her home for the two suspects. The officers in turn denied any search of the Valdez home and testified that the only time they were ever in Mrs. Valdez' home was at her invitation for a friendly chat over a cup of coffee.

The foregoing recitation hopefully depicts the rather tangled factual background out of which the present litigation stems.

## I.

As above indicated, all of the plaintiffs now appealing, except Juan I. Valdez, Elizardo Valdez and Filomena Valdez, complain of their so-called "mass detention" at Canjilon and assert that they were thus arrested or detained in violation of their constitutional rights by joint action of the district attorney, Sanchez, the State Police under Joe Black and the National Guard under General Jolly. As concerns the standard of conduct for the National Guard, the trial court instructed the jury as follows:

"When acting within the power vested in him, the Governor or the Acting Governor may order into active service the militia of the state and direct into what locality they shall go or operate. The Governor is made the sole judge of the facts that may seem to demand the aid and assistance of the military forces of the state. To his good judgment and sound discretion, the law has left the final decision as to whether the military arm of the state shall be ordered into active service.

"When the Governor orders into active service the National Guard after determining that its aid and assistance is necessary, the commander of the Guard may use the measure of seizing the bodies of those whom he considers to stand in the way of restoring peace. Such arrests are not necessarily for punishment, but are by way of precaution to prevent the exercise of hostile power.

"If you find from the evidence that the Governor had called out the National Guard and declared a state of extreme emergency in Rio Arriba County, and that the detention of plaintiffs was accomplished by the National Guard pursuant to such proclamation, and that such detention was made in good faith and in the honest belief that it was necessary under the circumstances to preserve peace, then you should find for the defendant·John Jolly and against the plaintiffs."

Plaintiffs argue that the foregoing instruction was erroneous, particularly that portion which declares that the National Guard is not liable to the plaintiffs if any "detention was made in good faith and in the honest belief that it was necessary under the circumstances to preserve peace." It is asserted that the standard of conduct is the same for both the National Guard and the State Police, namely, that in order for any arrest or detention to be lawful, such must be based on "probable cause," as opposed to mere "good faith." We do not agree.

The trial court's instruction was based on language from Moyer v. Peabody, 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410, which was later approved (admittedly with some distinctions being drawn) in Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375. In this particular connection, it is noted that even stronger language than that used in *Moyer* and embodied in the court's instruction is found in State ex rel. Charlton v. French, 44 N.M. 169, 99 P.2d 715 and State ex rel. Roberts v. Swope, 38 N.M. 53, 28 P.2d 4. In *Charlton* the Governor is said to be the sole judge of the facts that may demand the aid or assistance of the military forces of the state and in *Roberts* it was declared that the courts would not interfere with the executive in quelling disturbances and overcoming the lawless element in its resistance to authority.

By way of argument, it is intimated that *Moyer* and *Sterling* belong to another age and no longer represent the law on the subject. We reject this suggestion. Alternatively, it is contended that the language from *Moyer* used by the trial court in its instruction was taken out of context in that it presupposes an armed insurrection. In other words, it is argued, the evidence in *Moyer* admittedly disclosed that an armed insurrection in fact existed, whereas in the instant case there was really no insurrection and hence the instruction concerning the standard of conduct of the National Guard in time of insurrection was

improper. This line of reasoning permeates much of the entire argument of the plaintiffs and ignores the fact that the undisputed evidence establishes that there was a very real insurrection and civil disobedience in the armed raid on the courthouse in Tierra Amarilla. We find no error in the instruction thus given concerning the National Guard.

## II.

■ As concerns those plaintiffs complaining about their "mass detention" at the Leyba ranch near Canjilon, it is next urged that a directed verdict in their favor should have been entered on the issue of liability and that the only matter properly to be submitted to the jury was the assessment of their individual damages. It is argued that as a matter of law there was no probable cause for any arrest or detention of any of the plaintiffs by either the State Police or the National Guard. We have now considered and rejected the argument that the National Guard is bound by the same standard as that which the parties agree is the norm for the State Police and have held that the issue as to the liability of the National Guard was submitted to the jury under proper instructions. Similarly, in our view of the matter the issue as to the liability of the State Police also posed a jury question and the jury was properly instructed in connection therewith.

The parties agree, and we proceed on that premise, that any arrest or detention of any of the plaintiffs by the State Police must be on the basis of "probable cause" and that in connection therewith the defendants have the burden of proof. "Probable cause" was of course the subject matter of several instructions given by the trial court. The issue of probable cause in a proceeding such as the instant one is generally one for the jury unless there be no dispute in the testimony or the inferences deducible therefrom. Marland v. Heyse, 315 F.2d 312 (10th Cir.) and Stringer v. Dilger, 313 F.2d 536 (10th Cir.). Our review of the record convinces us that the issue of proba-

ble cause was properly submitted to the jury under proper instructions.

Counsel in arguing that the plaintiffs were only innocent campers soft-pedals the fact that the record clearly warrants the inference that the raid on the courthouse in Tierra Amarilla started and ended on the Leyba ranch. In other words, a meeting of the Alianza was held at the Leyba ranch on June 5, 1967, and out of the persons thus assembled some thirty, which number included men, women and children, proceeded from the Leyba ranch to Tierra Amarilla where they unlawfully and forcibly took over the courthouse. Several hours later, as dusk was beginning to set in, the raiders, or at least some of them, returned then to the Leyba ranch, with the State Police following and closing in on the entire group, with the National Guard later coming on the scene. It was in this setting that the State Police with the National Guard began to check out all persons in an effort to determine which ones had actually participated in the civil rebellion, be it as a principal or as an accessory. And as above indicated, certain of the participants were arrested as a result of these screening efforts. Under all of the circumstances of the case the issue of probable cause was a jury matter and not a matter of law to be resolved by the trial court.

## III.

■ Certain of the plaintiffs complain about the instructions given the jury concerning Sanchez, the district attorney, relating to the immunity and the extent thereof given him by virtue of the office he held. The gist of the instruction was that the law grants immunity to a district attorney for acts done or ordered by him in the performance of his official duties as an integral part of the judicial process, but that if a district attorney abandons the performance of his official duties and commits or directs the commission of acts which are ordinary police activity instead of judicial activity and orders the arrest or detention of persons in order to prevent

them from exercising their constitutional rights then he is no less liable than those who carry out his instructions. We perceive no error in the giving of this instruction and believe it to be in line with such cases as Kostal v. Stoner, 292 F.2d 492 (10th Cir.). *See also* Dacey v. New York County Lawyers' Ass'n, 423 F.2d 188 (2d Cir.), cert. denied, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92; Kauffman v. Moss, 420 F.2d 1270 (3d Cir.), cert. denied, 400 U.S. 846, 91 S.Ct. 93, 27 L. Ed.2d 84; Peek v. Mitchell, 419 F.2d 575 (6th Cir.); Sires v. Cole, 320 F.2d 877 (9th Cir.). Indeed the instruction thus given squares pretty much with Robichaud v. Ronan, 351 F.2d 533 (9th Cir.), the only case cited by counsel on the point. In *Robichaud* it was stated that when a prosecuting attorney acts in some capacity other than his quasi-judicial capacity, then the reason for his immunity (integral relationship between his acts and the judicial process) ceases to exist and if he acts in the role of a policeman, he should be liable as a policeman.

### IV.

■ At the conclusion of the plaintiffs' presentation of evidence the trial court, on motion, dismissed the claims of all plaintiffs, except Juan I. Valdez, arising out of the Coyote meeting of the Alianza on June 3, 1967. As concerns the Coyote meeting, it was the plaintiffs' theory that certain of the defendants, namely Sanchez, the district attorney, Joe Black, Chief of the New Mexico State Police, and several of the State Police conspired to and did in fact deprive them of certain first amendment rights. Actually, however, there was little or no testimony from any of the plaintiffs, except Valdez, concerning the Coyote meeting. The trial court in effect held that there was no showing of damage and that mere membership in Alianza was insufficient to carry this phase of the case to the jury. In this regard the trial court noted that no plaintiff (except Valdez) claimed that he or she was in anywise prevented by action of any defendant from attending the Coyote meeting. For all we know the plaintiffs (except Valdez) may well have attended the meeting in question. At least the testimony on this point is that no one turned back as a result of the roadblocks of the State Police. The only case cited by counsel on this particular matter, Carroll v. President and Commissioners of Princess Ann, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed. 2d 325, is not in point. On this state of the record we find no error on the part of the trial court in dismissing the claims of those plaintiffs (except Valdez) for damages in connection with the Coyote meeting.

### V.

As concerns the arrest of Elizardo Valdez and the allegedly unlawful search of the home of Filomena Valdez, counsel argues that in each instance the trial court erred in submitting the issue of probable cause to the jury. In this regard it is asserted that where "the material facts are not in dispute the question of probable cause to issue warrants or arrest or conduct a search are to be decided by the court alone," citing such cases as Banish v. Locks, 414 F.2d 638 (7th Cir.). The converse of this proposition is equally true, namely, if the material facts bearing on the issue of probable cause to make arrests and conduct searches are in dispute, then the issue of probable cause or no probable cause must be submitted to the jury. *See* Marland v. Heyse, *supra*, and Stringer v. Dilger, *supra*.

■ Regarding the complaint of Filomena Valdez that certain State Police conducted an unreasonable search of her home for two of her sons (not Elizardo) who had allegedly participated in the raid, it is sufficient to note that this was purely a matter of a dispute in the evidence. Filomena's testimony made a prima facie case of unreasonable search. However, the officers in question testified that the only time they were inside Filomena Valdez' home was upon invitation and with her consent and that no search as such was ever made. Because

of the dissimilar factual situation the instant case is not governed by Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797, as is urged by counsel. Rather this is but a controverted factual issue, and the jury by its verdict has now resolved the matter.

Concerning the arrest of Elizardo Valdez, our examination of the record convinces us that the material facts relating thereto, together with the inferences deducible therefrom, are such as required submission to the jury of the issue of probable cause. And the instructions tendered in behalf of Elizardo Valdez relating to the existence or nonexistence of "probable cause" for his arrest were in substance given by the trial court.

In this same general connection, complaint is also made that the instructions precluded the jury from reexamining the determination of probable cause made by the district judge issuing the warrant calling for Juan I. Valdez' arrest. The judge who issued the arrest warrants is of course not a defendant in the present proceeding, as it is well established that judges are immune from liability for damages in a civil rights proceeding for acts committed within their judicial jurisdiction. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed. 2d 288. However, the instructions left open for jury determination the matter as to whether Sanchez, the district attorney, presented to the judge any facts which he knew were "inaccurate or not correct in order to establish probable cause" and went on to advise the jury that if Sanchez had thus misrepresented the matter then the jury should find against him and in favor of the plaintiff Juan I. Valdez. We perceive no error in the trial court's handling of this phase of the controversy.

## VI.

Finally, it is urged that the court's instruction on conspiracy given the jury in connection with the claim of Juan I. Valdez was erroneous in that it was too restrictive "requiring in effect a showing of 'invidious discrimination.'"

This point is only briefly alluded to and is without merit. Actually, the trial court did not by its instruction "require" a showing of invidious discrimination, and the instructions defining conspiracy, when considered in their entirety, are proper under the facts of the case. The only authority cited on this phase of the case is Birnbaum v. Trussell, 371 F.2d 672 (2d Cir.), which we deem to be inapposite.

In sum, our study of the voluminous record convinces us that the plaintiffs have now had their day in court and that the varied issues were properly submitted to the jury under instructions that are without the defects now suggested by the several plaintiffs.

Judgments affirmed.