Richard L. ANDERSON, Plaintiff,

v.

David W. REYNOLDS and W. L. (Joe)
Gee, Defendants.

No. C 63–70.

United States District Court,
D. Utah,
Central Division.

March 9, 1972.

Ronald C. Barker, Salt Lake City, Utah, for plaintiff.

Harold G. Christensen, Salt Lake City, Utah, for defendant W. L. (Joe) Gee.

Verl R. Topham, Salt Lake City, for defendant David W. Reynolds.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHRISTENSEN, Senior District Judge.

This is an action for damages in reliance upon the Civil Rights Acts, 42

U.S.C. §§ 1983, 1985(3).[1] Jurisdiction is claimed in the complaint by virtue of 28 U.S.C. § 1343.[2] It will also be assumed that plaintiff's action includes pendant state claims for false arrest and defamation.[3] The case was tried in August, 1971. Collateral intra-court assignment problems have intervened but these now have been resolved and the parties have submitted the issues of fact and law upon the evidence heretofore received, the oral arguments following the trial, and upon later briefs and memoranda, the latest of which is a supplemental note of points and authorities furnished by counsel for the plaintiff

1. "§ 1983. Civil action for deprivation of rights
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
"§ 1985(3). Depriving persons of rights or privileges
"(3) If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

2. "§ 1343. Civil rights and elective franchise
"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
"(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;
. . . . .
"(3) To redress the deprivation, under color of any state law, statute or ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States.
. . .

"(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights. . . ."

3. The complaint does not expressly plead any pendant claims; and its reference to "derogatory statements" to the hospital and others, and the alleged lack of justification for plaintiff's arrest could be interpreted merely as an attempted enhancement of the damages claimed for the alleged civil rights violation. In the pretrial conference order pendant state claims are not expressly referred to in plaintiff's statement of his claims. However, there is there a recitation that among the means employed in violating plaintiff's "rights" was "[c]ausing a warrant to be issued for plaintiff's arrest without probable cause to believe that plaintiff had committed an offense." It was further said that "plaintiff claims that the acts of Defendants were done maliciously." Expressly reserved in the pre-trial order as issues in addition to those expressly relating to the asserted deprivation of constitutional rights were: "(d) Did the defendants make any false and defamatory statements concerning the plaintiff [together with sub-issues as to privilege]. . . . (g) Was the arrest of plaintiff unlawful? . . ." The arguments and briefs in part have concerned the question of false arrest and defamation. The evidence was of adequate scope to permit a determination of these issues as pendant, subject to appeal from any determination made here. If not pendant, such state claims would appear to be barred by the state statute of limitations and thus precluded from any separate proceeding in the state court since more than a year had lapsed between the accrual of the claim and as early as the time of trial here. See 78–12–29, Utah Code Annotated 1953. Considering these factors and the right of the court to permit the amendment of pleadings to conform to the proof (Rule 15(b) Fed.R.Civ.P.), I am constrained to consider and rule upon the said additional state claims as pendant to the civil rights claim.

under date of February 28, 1972. Now deeming itself fully advised, the court now makes and enters the following:

## FINDINGS OF FACT

1. At all times material herein the plaintiff was licensed under the laws of the State of Utah as a physician and surgeon and under the laws of the United States to purchase, prescribe, administer and professionally use narcotics.

2. Defendant David W. Reynolds, hereinafter referred to as defendant Reynolds, at all times material to this cause was an employee of the Department of Business Regulation and is and was the chief narcotics investigator of the State of Utah.

3. Reynolds' only association with the plaintiff prior to the events involved herein was participation in an investigation of plaintiff conducted in 1964 by the Department of Business Regulation and other law enforcement agencies when two small girls died following tonsillectomies in the office of plaintiff. There is no evidence that there was any impropriety on the part of plaintiff in connection therewith or that Reynolds entertained malice against the plaintiff as a result thereof.

4. Defendant W. L. (Joe) Gee, hereinafter referred to as defendant Gee, is and at all times material to this cause was a Salt Lake County Deputy Sheriff assigned to the narcotics detail as a detective. He had no association with the plaintiff prior to the events hereinafter set forth.

5. All acts done by the defendants which are material to the issues in this case were done under color of office while the defendants were acting in their official capacities as law enforcement officers of the State of Utah, and in particular were done in connection with their assignments concerning narcotics.

6. On December 18, 1969, while making a routine pharmacy inspection at Grand Central Pharmacy, 3271 East 3300 South Street, Salt Lake County, Utah, defendant Reynolds discovered an unusually large number of prescriptions for injectable morphine sulphate and Demerol, both Class A narcotics, which prescriptions were written upon prescription blanks of the plaintiff and bore signatures purporting to be those of the plaintiff. In canvassing other pharmacies in the same neighborhood, Mr. Reynolds found numerous other almost identical prescriptions. A pharmacist had relayed to the investigator plaintiff's claim to him that his wife had forged his name on prescriptions filled by that pharmacist. Defendant Reynolds asked defendant Gee to assist him with his investigation and at a time prior to December 29, 1969, defendants Reynolds and Gee interviewed the plaintiff's wife. She told them that the signature upon the prescriptions appeared to be that of the plaintiff.

7. The defendants had only partial, if any, confirmation of plaintiff's relayed claim when they first contacted plaintiff and had reasonable grounds to further check other sources of information, including the narcotics records of the plaintiff, in attempting to reach a conclusion whether, or in what respect, the narcotics laws had been violated and, if so, by whom.

8. On December 29, 1969, the defendants visited the office of plaintiff as a part of their investigation. Defendants had no appointment and gave no advance word, although it is reasonable to infer from the evidence that plaintiff had anticipated an investigator might call, and were required to wait for the plaintiff to complete routine surgery in progress when they arrived. Defendants were then admitted to plaintiff's private office, gave plaintiff the "Miranda warning", and asked to see plaintiff's narcotics records. Plaintiff produced for inspection copies of a U. S. Treasury Department form by which narcotics are ordered from drug suppliers but refused to permit inspection of any records of drugs actually received, administered, dispensed, prescribed, or professionally used by him.

At this meeting the plaintiff said that he had not increased his administration of narcotics and when informed that his order forms so indicated, he stated that narcotics had been stolen from the office but that he had not reported the theft. Plaintiff during this interview stated that he had talked to his attorney and his attorney had advised him not to say anything.

9. The defendants requested to see plaintiff's "narcotics records" and in the context of the evidence of what was then said and done it is clear that all parties understood that this included patient treatment records at least to the extent necessary to check questioned prescriptions in their names. There is no proof that plaintiff then kept narcotics records other than U. S. Treasury order forms and patient treatment records. Except for the former, however, plaintiff refused to furnish or permit inspection of any patients' records and of any narcotics records whatsoever. On this occasion defendants did not have any releases or consents from plaintiff's patients.

10. Defendants again visited the office of plaintiff without an appointment on Saturday, January 10, 1970, and again were required to wait while plaintiff completed routine surgery then in progress. After an extended delay the defendants were permitted to see plaintiff, repeated the "Miranda warning", demanded that plaintiff give defendants access specifically to plaintiff's patient treatment records, advised plaintiff that no doctor-patient relationship privilege existed in Utah when narcotics records were required from physicians, that no patients' releases were required in such cases, and that plaintiff would be guilty of a crime if he refused to permit inspection of his narcotics records. Plaintiff requested that he be permitted to call his attorney and to have his attorney present during this interview, located his attorney at a local Justice of the Peace court where he was trying a case, and was advised that his attorney would come to plaintiff's office as soon as the trial was completed, which was expected to be ½ to 1 hour, or that he would make a later appointment. A further discussion followed concerning the claimed right of the defendants to see patient treatment records without patient releases, and on advice of plaintiff's attorney the plaintiff refused to permit inspection of the patient treatment records at least without his attorney being present and until his attorney had sufficient time to familiarize himself with the laws relied upon by defendants concerning said records and to advise plaintiff concerning those laws. Defendants refused to wait for plaintiff's attorney to arrive and left without seeing any records on this occasion.

11. At the December 29 interview, there was an unqualified refusal on the part of the plaintiff to permit defendants to examine any of his narcotics, including patient treatment, records which was not conditioned upon further opportunity to consult with his attorney. At the January 10 interview, as aforesaid, the plaintiff refused to permit inspection of his records at least without the presence of his attorney.

12. At no time after January 10, 1970, and until the time of plaintiff's arrest did plaintiff communicate with defendants or offer to make any of his narcotics records available to them, nor did defendants communicate with plaintiff. Plaintiff at no time sought to modify his December 29 refusal of records or to clear up with the defendants the unlawful use of his prescription forms by his wife.

13. Especially on the January 10 interview, the defendants as well as the plaintiff became exercised and to a degree resentful at the positions taken by the other. But it is a reasonable inference that the defendants' personal feelings stemmed from the fact, and were substantially limited to the belief, that plaintiff was acting unreasonably and contrary to law in refusing access to his narcotics records, and that in view of the circumstances his suspected participation in the narcotics problem as

well as that of others warranted further investigation. The court finds also that there has been no evidence adduced aside from the question of the unavailability of records and any concealment of known facts concerning the conduct of others and, particularly, his wife, that the planitiff did not conduct his practice in a lawful and ethical manner aside from the inattention claimed by the hospital hereinafter mentioned.

14. Following the January 10, 1970, interview, the defendants continued their investigation and confirmed that at least some of the prescriptions appeared to be forgeries, that most of the persons whose names appeared on the prescriptions as patients were unaware of the prescriptions and were not receiving narcotics, but that all persons shown on the prescriptions as patients were or had been patients of the plaintiff.

15. Prior to the events here considered the Holy Cross Hospital had under consideration a refusal to renew the hospital privileges then enjoyed by plaintiff by reason of problems concerning failure to complete patient treatment charts, plaintiff's unavailability at various times when needed, and other complaints with respect to plaintiff's care of his patients, and a vote had been taken by the respective committees to recommend that his hospital privileges not be renewed for the year 1970. Said recommendation was not final and was subject to review by higher hospital authorities and was subject to rights of appeal by plaintiff. Plaintiff had not then been advised concerning the actions being taken by the hospital concerning his privileges. Similar action was being taken concerning other physicians with similar hospital privileges and such action in any event would not have been effective until approximately April 17, 1970, and then only if existing problems were not resolved prior to that date and/or any appeal proved unsuccessful.

16. About January 22, 1970, defendants visited the Holy Cross Hospital where they interviewed the hospital administrator and other persons in connection with their investigation of the plaintiff and prescription forms purportedly signed by him. During the course of the interview defendants advised the administrator that the plaintiff was the subject of a "narcotics investigation" and shortly thereafter at the request of a member of the hospital staff defendant Reynolds wrote a letter to Holy Cross Hospital advising the hospital that the defendants were conducting a narcotics investigation concerning plaintiff. At this time the defendants had not completed their investigation and were seeking confirmation of some of their information indicating that patients of Dr. Anderson who had been in said hospital had not received narcotics ostensibly prescribed by Dr. Anderson. The statements made to the hospital were substantially true and were made in supposed furtherance of the investigation then being conducted by the defendants.

17. On January 27, 1970, plaintiff was advised that his employment in the emergency room of the Holy Cross Hospital was terminated because he was no longer a member of the staff of the hospital as required for the continuance of that employment, which employment paid plaintiff approximately $1,000 per month. Plaintiff has never been reinstated in said employment and has not received income from that source from and after that date. It has not been established by a preponderance of the evidence that the disclosure of defendants' investigation proximately caused eventual termination of plaintiff's privileges at the hospital for there were other reasons for termination which the preponderance of the evidence indicates would have led to the same result. However, the preponderance of the evidence does show at least that the termination of privileges on January 27, 1970, rather than on the usual renewal or termination time of April 17, 1970, was proximately caused by the defendants' statements to the hospital concerning their investigation of plaintiff.

18. During the course of the investigation, defendant Gee conferred on several occasions with Paul VanDam, Chief Criminal Deputy in the Salt Lake County Attorney's office. At one such conference, held the forenoon of February 9, 1970, defendant Gee informed Mr. VanDam of Mr. Reynold's request to inspect the plaintiff's narcotics records on December 29, 1969, and on January 10, 1970, and of the plaintiff's refusal in the presence of defendant Gee to permit such inspection. Mr. VanDam thereupon prepared a complaint charging the plaintiff with failure to allow inspection of narcotic records in asserted violation of Section 58–13a–34, U.C.A., 1953,[4] and authorized the issuance of a warrant of arrest on the reverse of the complaint. Defendant Gee then took the complaint to Salt Lake City Judge Maurice Jones, discussed it with Judge Jones and swore to it in the presence of Judge Jones. Judge Jones thereupon issued the complaint and a warrant of arrest for the plaintiff.

19. In presenting information to the Salt Lake County Attorney's office, and in presenting the proposed warrant of arrest to the judge of the City Court of Salt Lake City who approved the complaint and executed the warrant of arrest, the defendant Gee disclosed the relevant facts concerning the refusal of plaintiff to permit inspection of his records. While the evidence was general in this respect there was no indication either on direct or cross-examination of Gee or otherwise that such disclosure was not full and fair on the facts. On the plaintiff's contention that no disclosure was made concerning the asserted invalidity of the statutory basis for this charge, the court finds that while this doubtlessly was true the defendant

Gee had no knowledge or notice of such claimed invalidity and no duty to advise the County Attorney or the Judge with respect thereto.

20. During the afternoon of February 9, defendant Gee attempted to locate the plaintiff to execute the warrant of arrest but was unable to do so. Arrest of the plaintiff ultimately was accomplished near the entrance to the plaintiff's office at about 6:30 p. m. The plaintiff was not searched, physically restrained, or handcuffed. He was taken directly from the entrance to his office through a shopping area directly to defendant Gee's car and then immediately to the Salt Lake County jail, from which he was released on bond during the evening of February 9. Defendant Gee had made several contacts with David Block, a news reporter for KUTV Channel 2, concerning the proposed arrest of plaintiff, including a meeting at approximately 23rd East and 33rd South in Salt Lake County during the afternoon of that day, and including the advising of said reporter to monitor his radio calls to learn when the arrest was about to take place so he could be present and film the arrest. The evening of the arrest a film and commentary were aired over at least one television station in addition to the usual newspaper notices of such arrest. While the TV contacts were made upon the initiative of said Block, defendant Gee, as it seems to the court, displayed unseemly interest in facilitating TV coverage of the arrest. Despite any understandable feeling that plaintiff had frustrated his investigation and that the arrest of plaintiff was newsworthy, and not unmindful of the accepted general cooperation between the news media and law enforcement officers, I see no reasonable justification for

---

4. "58–13a–34. Records privileged—divulging of information forbidden.—Prescription, orders, and records, required by this act, and stocks of narcotic drugs, shall be open for inspection only to federal, state, county, and municipal officers, whose duty it is to enforce the laws of this state or of the United States relating to narcotic drugs. No officer having knowledge by virtue of his office of any such prescription, order, or record shall divulge such knowledge, except in connection with a prosecution or proceeding in court or before a licensing or registration board or officers, to which prosecution or proceedings the person to whom such prescription, orders, or record relate is a party."

the extent of the "cooperation" between defendant Gee and Block which resulted in the direct filming and broadcasting of the arrest.

21. Following the time that plaintiff confronted his wife with copies of certain forged prescriptions, plaintiff and his wife separated and were later divorced. After plaintiff's arrest she was prosecuted by defendants for forgery of prescriptions in the criminal courts of the State of Utah and was convicted.

22. The defendants did not conspire between themselves or with anyone else to injure plaintiff or to violate his constitutional rights. Their activities, except for defendant Gee's cooperation with Block in permitting additional publicity concerning plaintiff's arrest, were conducted cooperatively in a good faith attempt to fully investigate circumstances which reasonably justified full investigation at the times involved, and to prosecute those believed guilty of criminal offenses. The defendants did not have knowledge or notice of invalidity of the statute under which they assumed to act.

23. Plaintiff in his pre-trial statement also claimed that he had been the victim of an unlawful search and seizure of his person, papers and records; that he was denied his right to counsel; that he was denied his privilege against self-incrimination; that he was denied the right to a fair trial because of attendant excessive and improper publicity; that he was denied his right to a speedy trial, and that there was unlawful wiretapping of his telephone. The latter claim was withdrawn at the time of trial. Except as otherwise found hereinbefore, as to all of the said additional claims the court finds that no evidence has been introduced tending to sustain them and that the plaintiff has failed to establish any of his claims by a preponderance of the evidence.

From the foregoing Findings of Fact, the court now draws the following:

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter of this action and the person of the parties.

2. The plaintiff was a person authorized to use narcotic drugs and required to keep records of such drugs within the meaning of Section 58–13a–21, U.C.A., 1953, which provides:

"Every physician, dentist, veterinarian, practitioner or other person who is authorized to administer or professionally use narcotic drugs, shall keep a record of such drugs received by him, and a record of all such drugs administered, dispensed, or professionally used by him otherwise than by prescription. It shall, however, be deemed a sufficient compliance with this section if any such person using small quantities of solutions or other preparation of such drugs for local application shall keep a record of the quantity, character, and potency of such solutions or other preparations purchased or prepared by him, and of the dates when purchased or prepared."

3. The records the plaintiff was required to keep were as further set forth in Section 58–13a–25, *Id.*, which provides in part:

"The record of all narcotic drugs sold, administered, dispensed, or otherwise disposed of, shall show the date of selling, administering or dispensing, the name and address of the person to whom, or for whose use, or the owner and species of animal for which the drugs were sold, administered or dispensed, and the kind and quantity of drugs. Every such record shall be kept for a period of two years from the date of the transaction recorded. The keeping of a record required by or under the federal narcotic laws, containing substantially the same information as is specified above, shall constitute compliance with this section, except that every such record shall contain a detailed list of nar-

cotic drugs lost, destroyed, or stolen, if any, the kind and quantity of such drugs, and the date of the discovery of such loss, destruction, or theft."

4. It was claimed by defendants, and there was reasonable basis for such claim, that plaintiff's records were subject to inspection by them by virtue of the provisions of Section 58–13a–34, *Id., supra.*

5. It was the duty of the defendants to enforce the narcotic laws of the State of Utah by virtue of Sections 58–13a–43 and 43.1, *Id.*, which provides in pertinent part:

"It is hereby made the duty of the department of registration, its officers, agents, inspectors, and representatives, and of all peace officers within the state and of all county attorneys, to enforce all provisions of this act, except those specifically delegated, and to co-operate with all agencies charged with the enforcement of the laws of the United States, of this state, and of all other states relating to narcotic drugs.

"Such agents or inspectors of the department of registration shall be given the oath of office by the clerk of the Supreme Court of the state of Utah and shall have the power to arrest and to bring about prosecutions of · violations of any provisions of this title, to serve criminal process, and shall have the right to require aid in the execution of their duties from any state, county and city police officers. The powers and duties hereby conferred upon such agents or inspectors shall extend throughout the state.

"It shall be the duty not only of all city, county and other local law enforcement agencies or officers thereof to enforce the provisions of this chapter, but also the duty of any state law enforcement agency or officers there-

of, including the department of business regulation and the liquor division of the state department of public safety, if such division is created for the enforcement of the liquor laws of the state of Utah."

6. The patient records of the plaintiff to the extent that they contained narcotics records required to be kept by him were not privileged under the provisions of Section 78–24–8(4), U.C.A. 1953, which provides:

"A physician or surgeon cannot, without the consent of his patient, be examined, in a civil action, as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient."

Refusal of inspection of his narcotic records by plaintiff upon the ground that they were privileged, was unjustified.[5]

7. Even though narcotic records required by law to be kept might not be subject to seizure either with or without a search warrant by reason of the right of persons to be secure against unreasonable searches and seizures or against self-incrimination, this would not necessarily relieve plaintiff from liability for prosecution for refusal to permit inspection of his records.[6] This is hardly the type of case involved in Bivens v. Six Unknown Fed. Narcotics Agents, 403 U. S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Concluding as I do that the court has jurisdiction under the Civil Rights Acts, jurisdiction need not be predicated as in *Bivens* directly upon the Fourth Amendment. There is little resemblance of facts. There inspection of records of a licensee was not involved. Here there was no attempted forced seizure, no compelled self-incrimination, no arrest without a warrant. Compare also United States v. Biswell, 442 F.2d 1189 (10th Cir. 1971).

---

5. *See* 58–13a–34, Utah Code Annotated, 1953, *supra.*

6. *See* Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.

2d 60 (1970). *Cf.* SEE v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) ; Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

■ 8. The plaintiff was not denied his right to counsel or his right to a speedy and public trial by an impartial jury as guaranteed by Amendment V and Amendment VI, Constitution of the United States. The plaintiff's arrest was not a deprivation of any right, privilege or immunity secured by the Constitution or laws of the United States within the meaning of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

9. The arrest of the plaintiff was not the result of any conspiracy for, or any deprivation of, the equal protection of the laws or of equal privileges and immunities under the laws of the United States within the meaning of the Ku Klux Klan Act, 42 U.S.C. § 1985(3).

■ 10. The plaintiff asserts that his constitutional rights to a speedy trial were violated by an excessive period between the alleged offense and his arrest. He relies in this assertion on three cases: In Godfrey v. United States, 123 U.S. App.D.C. 219, 358 F.2d 850 (1966), it was held that the delay between the offense and the filing of the complaint—somewhat less than two months—was reasonable but that the delay of some 36 days between the filing of the complaint and the arrest was not. In Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965), it was held that a conviction for narcotics would be reversed on grounds of denial of due process because defendant under circumstances was unable to defend himself and delay was "oppressive" where complaint was not sworn out until seven months after the alleged offense. In People v. Hernandez, 166 N.W.2d 281 (Mich.App.), violation of due process was found from 42 days' lapse between the alleged sale of narcotics and the arrest. It was there held that procedural due process requires a timely arrest to allow the defendant the use of his memory to determine existence of res gestae witnesses and to prove a defense. It is unnecessary to determine whether under some circumstances the doctrine of those cases which seems largely peculiar to their respective jurisdictions should be applied in the Tenth Circuit which as yet has given no indication of hospitality thereto. In the line of cases relied upon it is not the delay itself but lack of reason therefor and prejudice to a defendant therefrom which are the basis of the rulings. There was no prejudice to the plaintiff from the 42 days elapsing between the first demand upon him to inspect his records and the filing of the complaint, nor from the additional hours which intervened between the filing of the complaint and the arrest. The case against Dr. Anderson was dismissed before trial for reported failure of the prosecution to furnish a bill of particulars and this is not a case where the delay prevented a defendant from properly defending himself against the charge.

■ 11. The defendants did not violate plaintiff's right to be secure against unreasonable searches and seizures. The plaintiff was not searched, his office was not searched. No records were seized; plaintiff refused access to his records. The defendants left after some disagreeable words on both sides were spoken.

■ 12. Although the court would not have jurisdiction over claims for false arrest and defamation standing alone, such claims are pendant to the claims made by the plaintiff under the Civil Rights Act and, accordingly, the court should dispose of the issues pertaining to the claim of false arrest and defamation in this action.

13. The complaint filed by defendants and upon which plaintiff's arrest was based is not deficient on its face.

14. The statute alleged to have been violated involves a penalty for violation thereof when read in connection with related statutes in that general penalty provision of the particular statute [7] as

7. "Any person violating any other provisions of this chapter, except those classified as a misdemeanor, or for which special imprisonment and fine provisions have been specified above, upon conviction shall be punished for the first offense by fine of not less than $1,000 nor more than $10,000 or by imprisonment in the Utah state

supplemented by the general provisions of the penal code [8] may apply to provide a penalty by imprisonment.[9] Be this as it may, even though a prison sentence might not be imposed because the statute most directly applicable involves only the specification of a minimum prison term and not a maximum, there would still be a valid provision for a substantial fine which would have authorized arrest on warrant had there been no other question. The invalidity, if any, of the imprisonment provision in my opinion would not have rendered the entire statute invalid. *Cf.* Reese v. Olsen, 44 Utah 318, 139 P. 941 (1914).

15. The statute relied upon by defendants although in a sense framed in terms of limitation, in that it provides that narcotics records "shall be open for inspection only to federal, state, county, and municipal officers, whose duty it is to enforce the laws of this state . . . relating to narcotic drugs . . ." (Utah Code Annotated, 58–13a–34,

*supra*), renders it reasonably clear that such records shall and are open to inspection by the officers specified and likely also that it is the duty of licensees to permit such inspection.

16. The fact that the statute relied upon in said complaint failed to specify what methods, means or procedures were to be followed in inspections, and failed to specify limitations as to time, place, and purpose, except the purpose of enforcement of the Narcotics Acts, did not render inspection under the circumstances of this case patently unlawful and would not place a person of ordinary intelligence desiring to obey the law in a position of mere speculation as to the meaning of the statutes under peril of his liberty and property.

17. The failure of the Department of Business Regulation of the State of Utah to promulgate regulations as to records pursuant to 58–13a–25, U.C.A. 1953,[10] did not render said statute

prison for not less than one year or by both such fine and imprisonment and for any subsequent violation of this act not specifically designated as a misdemeanor or for which special imprisonment and fine provisions have been specified above shall be punished by a fine of not less than $5,000 nor more than $30,000 or by imprisonment in the Utah state prison for not less than five years or more than life at the discretion of the court or by both such fine and imprisonment."

8. 76–1–15 U.C.A.1953: "Except in cases where a different punishment is prescribed by law, every offense declared to be a felony is punishable by imprisonment in the state prison not exceeding five years. . . ."

9. *But see* 77–35–20. "Sentence—Term—Construction.—Whenever any person is convicted of any crime, except treason or murder in the first degree, committed after May 12, 1919, and the judgment provides for punishment in the state prison, the court shall not fix a definite term of imprisonment; but the sentence and judgment of imprisonment in the state prison shall be for a period of time not less than the minimum and not to exceed the maximum term provided by law for the particular crime for which such person has been convicted. . . ."

10. "58–13a–25. Form of records.—The form of records shall be prescribed by the department of registration. The record of narcotic drugs received shall in every case show the date of receipt, the name and address of the person from whom received, and the kind and quantity of drugs received; the kind and quantity of narcotic drugs produced or removed from process of manufacture, and the date of such production or removal from process of manufacture; and the record shall in every case show the proportion of morphine, cocaine, or ecgonine contained in or producible from crude opium or coca leaves received or produced and the proportion of resin contained in or producible from the plant Cannabis Sativa L. received or produced. The record of all narcotic drugs sold, administered, dispensed, or otherwise disposed of, shall show the date of selling, administering or dispensing, the name and address of the person to whom, or for whose use, or the owner and species of animal for which the drugs were sold, administered or dispensed, and the kind and quantity of drugs. Every such record shall be kept for a period of two years from the date of the transaction recorded. The keeping of a record required by or under the federal narcotic laws, containing substantially the same information as is specified above,

vague, indefinite, void or unenforceable as applied to the records of physicians. The reference to regulations is general and relates to various preceding sections. The section last above quoted in the margin provides definite formal standards for "drugs received" records. Because definite formal guides as to other requirements have not been specified by regulation does not negate substantive requirements; nor is there anything in the statute indicating that its requirements are to be suspended until regulations have been promulgated.

■ 18. The state statutes as applied to the duty of physicians to keep and permit the inspection of their narcotics records are not models of statutory draftsmanship. They contain various imperfections and shortcomings. Indeed, as applied to the duty of physicians to keep and permit inspections of narcotics records they may well be in various contexts of questionable validity. As to a particular form of record, or as to the inspection of a certain type of record without reference to others, there is doubt whether the plaintiff could have been convicted of any violation by reason of a limited refusal of access. However, in this case the refusal of inspection on December 29, 1969, was general and intransigent, and was made under circumstances appearing to make not only reasonable but necessary the inspection of some narcotics records beyond the federal forms, if not all. But, more importantly, any defects in the statutes were matters of law which it was within the peculiar province of the County Attorney's office and the City Judge who issued the warrant of arrest to pass upon. Not every arrest for an alleged offense based upon an invalid statute, or one following which an accused is held to be innocent, establishes personal liability of an arresting officer. Indeed,

most frequently it does not; if it did, law enforcement would be brought to a standstill by the doctrine that the investigator and/or arresting officer was a guarantor of the guilt of the one arrested and the ultimate sustaining of the validity of a statute. The evidence in this case includes no indication that the defendants were aware of any defects in the statute that may have existed, or their significance. A disclosure of the facts which seemed to reasonably warrant prosecution having been made, prosecution having been instituted in good faith, a warrant of arrest having been approved by the appropriate legal and judicial officers and the warrant not being invalid on its face, no civil rights or false arrest liability can be premised upon its execution under the circumstances shown by the evidence,[11] notwithstanding the reservations the court has heretofore expressed concerning the advising of news media in advance of possible or likely times of arrest or as to how this might be ascertained through monitoring of law enforcement communications, which the evidence suggests is a practice not confined to this case.

■ 19. The revelation orally and by letter to the hospital of the pendency of the investigation against the plaintiff was substantially true, was without malice and involved the exchange of information between parties having a common legitimate interest in the subject matter of the disclosure. *See* Hales v. Commercial Bank of Spanish Fork, 114 Utah 186, 197 P.2d 910 (1948).

20. In sum, the lots of the investigators and the investigated here were difficult at best. When in the early stages of their work of running down what increasingly appeared to be serious narcotics abuses, the defendants were

---

shall constitute compliance with this section, except that every such record shall contain a detailed list of narcotic drugs lost, destroyed, or stolen, if any, the kind and quantity of such drugs, and the date of the discovery of such loss, destruction, or theft."

11. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). *See also* Beauregard v. Wingard, 362 F.2d 901 (9th Cir. 1966) and Valdez v. Black, 446 F.2d 1071 (10th Cir. 1971).

met with an intransigent block at the source of information apparently most promising it is understandable that errors of judgment including somewhat intemperate statements on both sides were occasioned. But determined efforts to run down obvious leads in an investigation or to bring to accountability those thought to be responsible for illegal obstruction does not of itself constitute malice. Defendants were confronted with exceptionally challenging and confusing circumstances, the explanation of which was peculiarly within the knowledge of plaintiff and within the scope of records the state statute required him to keep. Not only did plaintiff fail to give the investigators any explanation or meaningful records but on the first interview gave them misleading information about "stolen" narcotics. The officers did not press him to make any incriminating statements and were entirely reserved in this respect, but they did insist upon seeing his records. On the other hand, in retrospect, it also appears that the situation initially occasioning the investigation was due to criminal activity not on the part of the defendants but of someone else without plaintiff's participation except for a system making possible the utilization of plaintiff's forms unlawfully by another. Without knowing the full extent of the investigation or other facts, plaintiff may have been understandingly fearful of additional unknown complications consistent with his own innocence and yet commending to him and his counsel a refusal of cooperation at the particular time. The unexplained claim of the plaintiff to the investigator that narcotics had been stolen further complicated the situation. The issues in my judgment cannot be appropriately considered without considering in addition to information later revealed these and other factors as they appeared reasona-

bly in the developing course of the investigation.

21. I conclude that there is no reasonable basis for a judgment in favor of the plaintiff and against the defendants for violation of the Civil Rights Acts or for false arrest or defamation. The Clerk, accordingly, is directed to enter judgment of no cause of action on plaintiff's complaint, but without costs.[12]

12. Finding no other sound basis within the issues of this case for noting further my disapproval of the "cooperation" of Gee with the TV reporter, in my discretion I deny costs to the prevailing par-

ties. The defendant Reynolds was not directly involved therewith but at least did participate in the arrest under the TV lights.