Archie **CHESNEY**

v.

**Frederick E. ADAMS, Warden, Connecticut Correctional Institution, Somers, Connecticut, et al.**

Archie **CHESNEY**

v.

**John R. MANSON, Commissioner of Corrections, State of Connecticut.**

**Civ. Nos. 15308, H-20.**

United States District Court,
D. Connecticut.

June 24, 1974.

Michael J. Churgin, New Haven, Conn., for plaintiff.

Stephen J. O'Neill, Asst. Atty. Gen., Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

This is a suit by a state prisoner challenging primarily the constitutionality of the procedure used to transfer him from the Connecticut Correctional Institution at Somers to the Security Treatment Center at Connecticut Valley Hospital. On two occasions he was committed for indefinite custody and treatment pursuant to Conn.Gen.Stat. § 17–194a. His major contention is that these transfers to a hospital for the mentally ill were accomplished without the hearing that non-prisoners are afforded under Conn.Gen.Stat. § 17–178. The staff at Somers diagnosed him as paranoid, noting among his symptoms an exaggerated estimate of his legal rights and the delusion that he might be deprived of them. While some of his contentions are without merit, his basic claim that the transfer procedure denied him the equal protection of the laws is by no means a delusion; in fact, it is a well-founded view of constitutional requirements. Plaintiff also contends that various aspects of his treatment in prison—the forcible injection of a tranquilizer, confinement in administrative segregation for 22 days, and brief detention in a "strip cell" on three occasions—violate his Eighth and Fourteenth Amendment rights. Pursuant to 42 U.S.C. § 1983, he seeks declaratory relief and damages, and an injunction prohibiting the forms of treatment of which he complains.

### I. Facts

Plaintiff's incarceration at Somers began on June 4, 1971. At an earlier time, he had exhibited signs of confusion and agitation sufficiently strong to require hospital attention (see Discharge Summary, Saint Mary's Hospital, Brooklyn, N.Y., defendant's exhibit A), and had suffered from chronic alcoholism. However, his first four months at Somers were "unremarkable" (see Consultant's Report, Jan. 4, 1972, defendant's exhibit A), involving no contact with the prison's mental hygiene staff. Testimony of Dr. Edward Palomba, Transcript of July 10, 1973, Hearing (hereafter "Tr. II") 36.

On October 23, 1971, prison guards summoned medical attendants at 3:10 a. m. when plaintiff began behaving in a fashion later characterized as "hostile" (Testimony of Palomba, *supra*, 14) and "aggressive" (Consultant's Report, *supra*), involving loud yelling, expression of extreme fear, and anxiety. The medical attendants, after consulting Dr. Edward Palomba by telephone, injected plaintiff with Thorazine, a powerful tranquilizer, removed him to a "strip cell" in the hospital section of the prison, and handcuffed his hands behind his back. (See Testimony of Dr. Jacob Van Der Werff, Transcript of May 9, 1973, Hearing, hereafter "Tr. I," 40). Later in the morning, a second dose of Thorazine was injected, and at approximately 11:00 a. m. the handcuffs were removed, and

plaintiff was moved to a hospital room at the prison. He remained there for several days and then was returned to his cell. He alleges that he suffered side effects from the medicine, including a swollen tongue and dryness of the mouth, and that his side was bruised by guards during his removal to the "strip cell."

Twice subsequently, plaintiff was confined for three-day periods in a "strip cell (February 29–March 2, 1972; March 14–March 17, 1972), and injected with Thorazine. On both occasions, his symptoms were similar to those that caused the October 23 confinement. He feared that prison staff would deprive him of legal rights or physically injure him, an anxiety believed by prison medical staff to be delusional and paranoic. He did not threaten guards or doctors, but was thought to need restraint and calming. The prison hospital's "strip cell" is a bare room, approximately nine feet square, with tile floor and walls. The only toilet facility is a round hole in the floor that must be flushed from the outside. Testimony of Dr. Van Der Werff, Tr. I, 45.

Repetition of plaintiff's "disoriented" behavior caused his commitment to the Security Treatment Center on January 19, 1973. See Testimony of Hugh O'Hare, Tr. I, 95–107. The prison psychologist reported that plaintiff feared "aggressive assault" and manifested "inappropriate thought and actions." Defendant's exhibit C. A consultant psychiatrist interviewed him for approximately thirty minutes, and approved the psychologist's decision to transfer him to the Center, Testimony of Dr. Van Der Werff, Tr. I, 58–59. On April 4, 1973, following "remission" of his symptoms, the Security Treatment Center transferred him back to Somers.

Almost immediately following his return to Somers, plaintiff was placed in administrative segregation. Although he was entitled to many of the privileges accorded the general population, he was kept in virtual isolation and limited in recreational opportunity. See Testimony of John Plonski, Tr. II, 135–37.

Recurrence of his mental illness symptoms, alleged by plaintiff to have been the result of this isolation, resulted in his commitment to the Center again on April 27, 1973. He was returned to Somers on May 7, 1973, following subsidence of his anxiety.

As a result of these episodes, plaintiff has submitted numerous petitions and complaints to this Court. Consolidating them, the Court appointed counsel, and permitted an amended complaint to be filed. Three days of hearings were held, on May 9 and May 11, 1973 (Tr. I), and July 10, 1973 (Tr. II), and both sides subsequently filed briefs.

## II. *Standing and Jurisdiction*

■ At the threshold, defendant contends that plaintiff lacks standing to challenge Conn.Gen.Stat. § 17–194a because he is no longer confined at the Security Treatment Center, having been returned to the general population at Somers. Plaintiff's apprehension of additional commitments, however, is plainly not unfounded, in view of his repeated transfers in the past and defendant's favorable view of the procedures now in use. See Matthews v. Hardy, 137 App.D.C. 39, 420 F.2d 607, 612–613 (1969); Gomez v. Miller, 337 F.Supp. 386, 387 n. 1 (S.D.N.Y.1971), aff'd, 412 U.S. 914, 93 S.Ct. 2728, 37 L.Ed.2d 141 (1973); Fhagen v. Miller, 306 F.Supp. 634, 636–637 and n. 4 (S.D.N.Y.1969). That apprehension, combined with his claim for damages, present this Court with a controversy of "immediacy and reality," Maryland Casualty Company v. Pacific Coal and Oil Company, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941), and one that is clearly justiciable.

■ A determination of the constitutionality of the challenged statute does not require convening a three-judge court, since plaintiff has amended his complaint to seek only a declaration that the statute is invalid, without an injunction forbidding similar transfers See Kennedy v. Mendoza-Martinez, 372 U.S. 144, 154–155, 83 S.Ct. 554, 9 L.Ed.2d

644 (1963); Seergy v. Kings County Republican County Committee, 459 F.2d 308, 312–313 (2d Cir. 1972).

## III. *The Legality of the Commitment*

### A. Statutory Compliance.

■ There is a substantial question, although neither party has raised or briefed it, as to whether the commitment procedures that were applied to the plaintiff met the requirements of the challenged statute, § 17–194a.[1] That statute empowers the Commissioner of Corrections to transfer a prisoner to a state hospital for the mentally ill, following certification of mental illness by a physician and concurrence of the hospital superintendent. For neither of plaintiff's transfers, however, was authorization sought from the Commissioner of Corrections. The commitment form used on both occasions, though it provides for certification by a physician and the hospital director's concurrence, requires approval only by the superintendent of the "sending institution." No space is furnished for the Corrections Commissioner's signature; nor is there any indication that his transfer power has been explicitly delegated to any official. Above the signature spaces for the superintendents of the sending and receiving institutions, the source of authority for the transfer is stated to be the Commissioner of Mental Health, an official not mentioned in § 17–194a.[2] The statute referred to at that point on the commitment form, 1972 P.A. 145, §

3c (codified at Conn.Gen.Stat. § 17–210a(c)), does not justify in any way approval by the Commissioner of Mental Health as a substitute for that of the Commissioner of Corrections.[3]

Approval by the Commissioner of Corrections would be required under any of the statutes authorizing commitment of convicted defendants, regardless of how temporary. See Conn.Gen.Stat. § 17–244 (commitment for examination to diagnostic unit of the Security Treatment Center in preparation for sentencing); § 17–246 (transfers to Security Treatment Center from correctional institution). Only if plaintiff had been originally in an institution under the control of the Commissioner of Mental Health, Conn.Gen.Stat. § 17–248, would the approval of that official alone have been sufficient.

While a favorable ruling for plaintiff might rest on the narrow grounds of non-compliance, the issue of the constitutionality of the statute itself is fairly presented by this case. Even if the present procedures were revised, so that the forms reflected authorization by the Commissioner of Corrections or an official designated by him, the constitutional defect of the transfer statute would remain.

### B. *Constitutionality of § 17–194a.*

■ In considering the constitutionality of the procedures used to transfer Chesney from prison to a mental hospital, it is important to bear in mind

---

1. Notwithstanding the relative brevity of plaintiff's confinement in the Security Treatment Center, there can be no doubt that he was "committed" within the terms of § 17–194a. In their testimony, prison staff referred to each transfer as a commitment, *see, e. g.,* Testimony of Hugh O'Hare, Transcript of May 11, 1973, Hearing, 97, and their intention at the time of the transfers was that he be kept at the Center until he was able to "function effectively," in effect an indefinite period of time. See Testimony of Jacob Van Der Werff, Transcript of May 9, 1973, Hearing, 64.

2. The statement on the form states:

We, the undersigned, agree to the transfer, as described above, of the person named above. Such transfer is hereby authorized with the approval, or by the delegation of the authority, of the Commissioner of Mental Health as embodied in the General Statutes of the State of Connecticut, under the Section stated above.

3. Conn.Gen.Stat. § 17–210a(c) provides:
He [the commissioner of mental health] shall prepare and issue regulations for the administration and operation of the department of mental health, and all state-operated facilities and community programs providing care for the mentally disordered.

that he was not transferred for a brief, limited period of time to receive emergency treatment or diagnosis. This was a commitment for treatment of indefinite duration, with discharge back to prison left entirely to the authorities at the Security Treatment Center. With a commitment of this sort, the procedures used must be compared to those required in the case of a non-prisoner to assess the validity of plaintiff's equal protection claim.

The disparity in procedural rights between prisoners and non-prisoners subject to commitment is clear on the face of the statutes. Under § 17–178, a non-prisoner is entitled to a probate court hearing, at which he may cross-examine the two physicians (one a psychiatrist) who must be designated to examine him; he must receive reasonable notice of the hearing, along with appointed counsel and a transcript if he cannot afford them. Under § 17–194a a prisoner can be committed on certification of a physician, without any necessary consultation of a psychiatrist, without notice that he is under consideration for transfer, and without opportunity to contest findings. Under § 17–246, a prisoner has somewhat greater assurance of the accuracy of diagnoses, since a "complete mental and physical examination" must be made within thirty days of his arrival at the Center, but this scarcely minimizes the disparity in procedures used to effect the transfer.[4]

In practical operation, the disparity is even more dramatic. Commitment of a prisoner is in effect made by one or two individuals, often consultants rather than staff, on the basis of information gathered without his knowledge. (See Testimony of O'Hare, Tr. I, 107–109). As in plaintiff's case, the role of the psychiatrist is merely to review the report and recommendation of the prison psychologist, who is not a physician.

(See Testimony of Dr. Van Der Werff, Tr. I, 53–59). While the psychiatrist thus formally accepts responsibility for the decision to transfer, he does not independently formulate a diagnosis. Frequently a psychiatrist does not participate at all. (Testimony of Dr. David Hedberg, Tr. II, 59). There is no opportunity for airing conflicting diagnoses, as were present in plaintiff's case (Compare plaintiff's exhibit 2 with Testimony of Dr. Van Der Werff, Tr. I, 53 & 76), or even making the prisoner aware of them. The officials who commit a prisoner set no guidelines or time limit for deciding whether he should be returned. (Testimony of Dr. Van Der Werff, Tr. I, 64).

The mere existence of this disparity, however, does not mean that the statute abridges the Constitution, either facially or as applied. The success of plaintiff's equal protection challenge depends on two propositions: first, that incarceration in a mental hospital is sufficiently different from incarceration in a prison that prisoners must be afforded some measure of procedural protection when they are committed; and second, that the existing disparity between procedural protections afforded prisoners and civilians bears no rational relation to the purposes of incarceration or any other permissible state objective.

In this Circuit and the D.C. Circuit, the Courts of Appeals, dealing with substantially similar procedural disparities, have agreed with both propositions, concluding that prisoners transferred to mental hospitals must be granted substantially the same procedural rights afforded civilians. United States ex rel. Schuster v. Herold, 410 F.2d 1071, 1080–1084, 1089 (2d Cir. 1969); Matthews v. Hardy, *supra*, 420 F.2d at 610–612. Their reasoning relies heavily on Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), interpreting

4. While § 17–246 might have provided statutory authority for transfer under these circumstances (though constitutional hurdles would remain), defendant concedes that § 194a was the purported authority for plaintiff's transfers. Section 17–246 requires preparation of a report, which was apparently not done for plaintiff within the required time period.

that decision to hold that "the procedures to be followed in determining whether one is committable must be unaffected by the irrelevant circumstance that one is or has recently been under sentence pursuant to a criminal conviction, although the fact that one has committed a crime may be relevant to the substantive conclusion that he is mentally ill." United States ex rel. Schuster v. Herold, *supra,* 410 F.2d at 1081; Matthews v. Hardy, *supra,* 420 F.2d at 610 n. 11; see Cameron v. Mullen, 128 U.S.App.D.C. 235, 387 F.2d 193, 201 (1967).

The premise of the Second and D.C. Circuits is that commitment of a prisoner is not merely an administrative matter, within the broad and largely unreviewable discretion accorded prison officials. Rather, commitment compels prisoners to suffer additional "deprivations, hardships and indignities," United States ex rel. Schuster v. Herold, *supra,* 410 F.2d at 1080, that make incarceration in a mental hospital significantly different from confinement in a prison. The stigma attached to the mentally ill, the restrictions and routines in a mental hospital, the possibility of emotional and psychic harm, and the increased difficulty of obtaining parole— combine to make the prisoner "twice cursed."

In view of the deprivations he suffers from commitment, these courts have held that the place where a man happens to be at the time of mental illness has "no relevance" to the question of whether he should be transferred, even though he is already deprived of liberty in prison. United States ex rel. Schuster v. Herold, *supra,* 410 F.2d at 1083. While prisoners and non-prisoners need not be treated *identically*, the procedural distinctions must have some relevance to the purpose for which the classification is made, Baxstrom v. Herold, *supra,* 383 U.S. at 111; see also Griffin v. Illinois, 351 U.S. 12, 20, 76 S.Ct. 585, 100 L.Ed. 891 (1956). No such purpose justifies denial of a judicial determination of mental illness, Matthews v. Har-

dy, *supra,* 420 F.2d at 612, or of any mental disorder requiring care and treatment, United States ex rel. Schuster v. Herold, *supra,* 410 F.2d at 1084. The D.C. Circuit, construing 24 D.C.Code § 302 so as to save it from constitutional infirmity, interpreted it to mandate a hearing with the same rights of notice, counsel, and cross-examination accorded by the 1964 Hospitalization of the Mentally Ill Act, 21 D.C.Code § 501 et seq. The Second Circuit did not specify precise procedural safeguards that must be accorded prisoners committed under N.Y. Correction Law § 383 (McKinney Consol.Laws, c. 43, 1968) except to require periodic review of the need for continued commitment, as guaranteed to non-prisoners by N.Y. Mental Hygiene Law § 73 (McKinney Consol. Laws, c. 27, 1968 Supp.).

The deprivations and hardships suffered by prisoners committed to the Security Treatment Center pursuant to § 17–194a are substantially similar to those involved in *Schuster* and *Matthews*. While the two periods of plaintiff's confinement at the Center turned out to be relatively brief, some seventy-four days and ten days respectively, the stigma of his commitment will follow him nonetheless. The purpose of transfer was not observation or diagnosis; nor was the length of hospital time limited in advance. See defendant's exhibits C and B. The impact of the commitment on such matters as job possibilities and personal associations, if plaintiff is able to secure release, will not depend on the length of his incarceration in the Center. Indeed, the *repetition* of the commitment may render the stigma more damaging than additional length might have done.

Formally branded as mentally ill and confined among others actually suffering mental illness, prisoners committed to the Center are "exposed to physical, emotional and general mental agony" that may well lead "a man to question his own sanity and in the end to succumb to some mental aberration." United States ex rel. Schuster v. Herold, *su-*

*pra*, 410 F.2d at 1078. Told that his legal activities, refusal of medication, and general talk were "delusional" and "paranoid," (see plaintiff's exhibit 2), a prisoner in plaintiff's position might lose not only legal rights but also mental well-being. While the routines and restrictions of the Center are not a matter of record here, plaintiff was deprived at a minimum of any opportunity to pursue the job he had been assigned at one time at Somers, see defendant's exhibit E, or to receive any other form of vocational rehabilitation.

As in *Schuster*, a prisoner committed pursuant to § 17–194a encounters added hurdles in seeking parole.[5] The New York parole board had authority to grant committed prisoners parole, but in practice rarely did so, presuming them to be mentally ill, United States ex rel. Schuster v. Herold, 410 F.2d at 1076 n. 3. In Connecticut, a prisoner must be recommended for parole by the Center's medical staff before he may receive a parole board hearing, regardless of when he becomes eligible. Plaintiff's exhibit 6. (Statistics have not been made available regarding the proportion of committed prisoners who eventually are paroled.) Even if a prisoner receives the necessary recommendation, he suffers the additional disadvantage of "normally" receiving only a "medical parole" as a first step. *Ibid.*; Conn.Gen.Stat. §§ 17–198, 17–251.

Although there are factual differences between the *Schuster* and *Matthews* cases and this plaintiff's, none justifies labelling this commitment an "administrative" matter. Defendant's acceptance of the term "commitment" as applied to this case appears almost to concede as much. No argument is made to the contrary.

Nor is the disparity in procedural safeguards afforded prisoners and non-prisoners relevant to the smooth functioning of the prison or discipline of prisoners. See Matthews v. Hardy, *supra*, 420 F.2d at 611 n. 13. In case of emergencies, prisoners may be separated from the general population for observation and examination, a procedure comparable to the temporary confinement authorized by § 17–178 for non-prisoners deemed "dangerous" pending probate court proceedings. The procedure presently employed does not enhance the accuracy or comprehensiveness of diagnosis. On the contrary, it lacks the two-physician requirement of § 17–178, which along with other procedural safeguards, minimizes the chances of mistake. Rehabilitation of prisoners can hardly be a goal of the present procedure, since it adds to the arbitrariness and uncertainty of prison life without any compensating benefit in terms of either confidentiality or therapy. Nor is economy, though a permissible goal, sufficient alone to justify the procedure. Indeed, the large number of prisoners committed pursuant to § 17–194a—some 866 in the past three years, according to defendant—is evidence of the statute's impact in depriving rights as well as the possible costs of alternative procedures.

Defendant's only suggestion as to why § 17–194a is not invalidated by the decision in *Schuster* is that the plaintiff there was "in all probability sane." Clearly the constitutionality of procedures for transferring prisoners to mental hospitals cannot turn on the diagnosis made after they arrive.

The doctrine of *Schuster* and *Matthews* is not beyond challenge or criticism. The Supreme Court has taken note of these decisions, Humphrey v. Cady, 405 U.S. 504, 511 n. 7, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), but has studiously avoided deciding the issue,

---

5. The fact that plaintiff would not be eligible for parole until 1991, twenty years following the beginning of his incarceration for second-degree murder, does not dispel this aspect of possible injury, in view of the indefiniteness of the commitment.

see Murel v. Baltimore City Criminal Court, 407 U.S. 355, 357–358, 92 S.Ct. 2091; 32 L.Ed.2d 791 (1972), dismissing cert. as improvidently granted to 404 U.S. 999, 92 S.Ct. 567, 30 L.Ed.2d 552 (1971). Attacks upon analogous procedures authorized for the federal prison system under 18 U.S.C. § 4241, permitting the Attorney General to transfer federal prisoners without a semblance of due process, have been unsuccessful. Such transfers have been held within the Attorney General's broad administrative discretion, immune to judicial review unless made arbitrarily or capriciously. See, e. g., Jones v. Harris, 339 F.2d 585, 586 (8th Cir. 1964); Garcia v. Steel, 193 F.2d 276 (8th Cir. 1951); see also Sutton v. Ciccone, 292 F.Supp. 374 (W.D.Mo.1968).

But these attacks on § 4241 and other federal statutes authorizing broad transfer discretion, see, e. g., 18 U.S.C. § 4082, have alleged denial of due process, not equal protection. Moreover, most involved habeas corpus petitions, rather than complaints under § 1983. And almost all of them predated *Baxstrom*, which reshaped the landscape of prisoners' rights with respect to commitment, and other more recent cases, e. g., Humphrey v. Cady, *supra*; Jackson v. Indiana, 406 U.S. 715 (1972); McNeil v. Director, Patuxent Institution, 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972), dealing with similar issues.

■ The question of whether the procedure of § 17–194a violates plaintiff's due process rights need not be reached in this case. His equal protection claim is upheld since the deprivations that resulted from his indefinite commitments are sufficiently onerous, notwithstanding his prior incarceration, to entitle him to substantially the same procedural safeguards provided to non-prisoners.

■ Although the constitutionality of § 17–246 is not specifically in issue here, a declaration that § 17–194a is invalid certainly casts a shadow on that statute. The minor differences between the two statutes, such as the provision for a complete examination within thirty days of a prisoner's arrival, would not have saved § 17–246 if it had been claimed as the basis for plaintiff's commitment under the circumstances here. Therefore, while the question of its constitutional validity is not directly involved, its infirmity should prompt use of alternative procedures for future prisoner commitments.

■ One commitment procedure already available is that authorized by § 17–178 for civilians. Nothing in that statute precludes the Commissioner of Corrections from filing a complaint in probate court alleging a prisoner's mental illness and relying thereafter on the court's determination that the prisoner is "mentally ill and a fit subject for treatment in a hospital for mental illness." A prisoner would be accorded the full panoply of procedural rights afforded civilians under § 17–178, including counsel, access to records, examination by two reputable physicians (one a psychiatrist), cross-examination of them in court, and a free transcript of the hearing. Providing prisoners with these procedural protections prior to commitment would not greatly interfere with prison administration, or otherwise burden the state. This is not to say, however, that prisoners must be afforded exactly the same procedure that civilians receive upon commitment. The legislature may provide a commitment procedure differing from § 17–178 in ways that bear some rational relationship to the special requirements of prison administration while providing substantially the same procedural protection.

In an emergency case, where the Commissioner believes immediate *temporary* transfer to a hospital is desirable, he

may employ the procedure available under § 17–183, whereby "any person" certified by a physician as "a danger to himself or to others" may be confined in a hospital for fifteen days, and for an additional thirty days if during the fifteen-day period of observation, commitment proceedings are initiated. Although a procedure for temporary hospital confinement is also available under § 17–178, much more frequent use is made of § 17–183 with respect to civilians, see Comment, The Mentally Ill in Connecticut—A Survey, 6 Conn.L. Rev. 303, 356 (1974), and nothing in that section precludes its application to prisoners.

Although the statute under which defendant committed plaintiff was constitutionally defective, plaintiff is not entitled to damages. Defendant was acting in good faith, pursuant to a law that had not then been declared invalid. See Tucker v. Maher, 497 F.2d 1309, 1313 (2d Cir. 1974); Fleming v. McEnany, 491 F.2d 1353, 1357–1358 (2d Cir. 1974); see also Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); United States v. Dameron, 460 F.2d 294, 295 (5th Cir. 1972). The transfer papers were not facially defective, Fleming v. McEnany, *supra,* 491 F.2d at 1357; nor did defendant have any indication from the state attorney general or any other official that the statute might have constitutional defects, see Anderson v. Reynolds, 342 F.Supp. 101, 112 (D.Utah 1972).

Plaintiff's remaining claims have been considered and rejected in a memorandum of decision made available to counsel.

Accordingly, plaintiff's request for declaratory relief is granted and judgment will enter declaring § 17–194a unconstitutional. All other claims are dismissed.